UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRANDEIS UNIVERSITY,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>BIO-RAD LABORATORIES, INC.,<br><br>　　　　Defendant. | Civil Action No. 1:25-cv-12780 |

**FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND**

This is an action brought by Brandeis University ("Brandeis") against Bio-Rad Laboratories, Inc. ("Bio-Rad") for breach of contract, declaratory judgment, breach of the implied covenant of good faith and fair dealing, and violations of Massachusetts General Law Chapter 93A § 2, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

**THE PARTIES**

1.　Brandeis is a non-profit educational institution organized under the laws of Massachusetts having its primary place of business at 415 South Street, Waltham, Massachusetts, 02454-9110.

2.　Brandeis was founded in 1948 as a non-sectarian institution committed to providing a world-class education. Brandeis has more than 3500 undergraduate and more than 1000 graduate students, and employs more than 1500 faculty and staff.[1][2]

---

[1] https://www.brandeis.edu/factbook/enrollment.html.
[2] https://www.brandeis.edu/about/facts/index.html.

1

3. Brandeis is proud to be home to award-winning faculty and alumni, including those who have received Nobel Prizes, MacArthur Fellowships, and Pulitzer Prizes.

4. As a medium-sized research university with global reach, Brandeis is dedicated to first-rate education while making groundbreaking discoveries.[3] Research conducted by the faculty and students of Brandeis has been cited in numerous professional publications across multiple scientific and engineering disciplines.

5. On information and belief, Bio-Rad is a corporation organized under the laws of Delaware having its primary place of business at 1000 Alfred Nobel Drive, Hercules, California, 94547.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1441.

7. This action was originally filed in the Suffolk County Superior Court of the Commonwealth of Massachusetts, and removed by Bio-Rad to this Court on September 26, 2025. Dkt. No. 1.

8. Bio-Rad has consented to personal jurisdiction in this Court pursuant to the "Governing Law" clause of the parties' license agreement executed on December 22, 2011 and amended on March 21, 2019 (the "Agreement").[4] Agreement § 10.5. Brandeis' causes of action arise out of and specifically relate to the Agreement.

---

[3] https://www.brandeis.edu/our-research/index.html.
[4] Attached hereto as Exhibit A is a true and correct copy of the Agreement, which has been filed under seal pursuant to the Court's Order dated October 9, 2025. *See* ECF No. 17.

9.     Venue in this judicial district is proper pursuant to Section 10.5 of the Agreement. *Id.* Bio-Rad agreed that any action arising out of or related to the Agreement will be filed in courts of competent jurisdiction located in Boston, Massachusetts. *Id.*; *see also* Dkt. No. 1. ¶ 3.

## BACKGROUND

10.    Brandeis is a joint owner of U.S. Patent No. 8,592,221 (the "'221 Patent"). Pursuant to a Joint Invention Administration Agreement with non-party assignee President and Fellows of Harvard College, Brandeis has sole responsibility for administration of all rights in the '221 Patent, including filing, prosecution, maintenance, defense, enforcement, and licensing.

11.    Brandeis is the sole owner of U.S. Patent No. 8,772,046 (the "'046 Patent").

12.    The '221 Patent, '046 Patent, and patents related thereto are hereinafter referred to as the "Licensed IP."

13.    The Licensed IP describe structures and methods for (among others) producing and manipulating miniscule fluid droplets of precise size. This technology is valuable in important disciplines such as genetic analysis, chemical diagnostics, drug screening, and environmental monitoring.

14.    The Licensed IP was invented by the faculty and students of Harvard University and Brandeis within the Commonwealth of Massachusetts.

15.    On December 22, 2011, Brandeis and RainDance Technologies, Inc. ("RainDance") entered into the Agreement, which granted RainDance an exclusive license to the Licensed IP. Agreement § 2.1.

16.    On or around February 15, 2017, Bio-Rad acquired RainDance. *See* Amendment No. 1 to the Agreement.

17.    On March 21, 2019, Brandeis and Bio-Rad amended the Agreement to change,

3

among others, all instances of RainDance to Bio-Rad. *Id*. Thus, the parties to the Agreement are now Brandeis and Bio-Rad.

### A.     Bio-Rad's Responsibilities Under the Agreement

18.     Bio-Rad is required to pay Brandeis an annual royalty on the "Net Sales" of all Licensed Products. Agreement § 4.1, Agreement Exhibit A, Agreement Amendment 1.

19.     "Net Sales" means the Gross Sales (i.e., amount invoiced or payable for the sale of Licensed Products in arm's length sales or transaction) received by Bio-Rad or any sublicensee less certain specified expenditures. Agreement §§ 1.4 & 1.7.

20.     "Licensed Products" include any composition or method that would infringe the Licensed IP but for the existence of the Agreement. *Id*. § 1.6.

21.     Bio-Rad is required to use "commercially reasonable best efforts" to develop and make available Licensed Products for commercial sales and distribution. *Id.* § 3.1.

22.     Bio-Rad is required to use "reasonable discretion" in determining "commercially reasonable best efforts." *Id.*

23.     Bio-Rad must also submit annual progress reports (the "Annual Reports") detailing its progress (or lack thereof) towards commercialization and provide supporting documentation. *Id*. §§ 3.1, 3.2, Amendment 1.

24.     To enable determination of royalties payable under the Agreement, Bio-Rad is required to keep complete and accurate records in sufficient detail and retain those records for three years following the end of the year to which those records relate. *Id*. § 4.4.

25.     With 14 days' written notice, Bio-Rad must also permit Brandeis to periodically examine its books, ledgers, and records "for the purpose of and to the extent necessary" to verify any report required by the Agreement. *Id*.

26. Per the Agreement, Brandeis' audit right is not conditioned on any statements or actions by Bio-Rad.

27. In the event that an audit reveals underpayment of royalties owed, Bio-Rad agreed to pay the cost of the audit and all overdue amounts with accrued interest. *Id*. §§ 4.2, 4.4.

28. Bio-Rad is also required to provide Brandeis with an annual full and accurate reporting and accounting of (among others) the use or sales of Licensed Products by Bio-Rad or any sublicensees, "[w]hether or not a payment is due." *Id*. § 4.5.

29. Pursuant to Section 2.2 of the Agreement, Bio-Rad has the right to sublicense the Licensed IP, so long as any sublicense imposes the same royalties and responsibilities benefitting Brandeis and Bio-Rad promptly reports any such sublicense to Brandeis, including any royalty or non-royalty consideration under such sublicense agreements. *Id*. § 2.2.

30. To date, Bio-Rad has not reported any sales of Licensed Products, any sublicensing agreements, or any royalty or non-royalty payments received. Bio-Rad has also not paid any royalties to Brandeis or submitted any report regarding royalties or consideration as required by Section 4.5 of the Agreement.

31. In its progress reports pursuant to Section 3.2 of the Agreement, Bio-Rad claims that it did not sell Licensed Products in any accounting period to date, but has expended resources to develop and commercialize such products.[5] For example, the 2023 progress report confirms that some of the products Bio-Rad developed and commercialized "may be determined to be Licensed Products," and that Bio-Rad continues its licensing efforts with third parties. Exhibit B.

---

[5] Attached hereto as Exhibit B is a true and correct copy of Bio-Rad's 2023 Progress Report, which has been filed under seal pursuant to the Court's Order dated October 9, 2025. *See* ECF No. 17.

32. Despite repeated requests, Bio-Rad has never provided any details or supporting documentation regarding the purported development and commercialization of Licensed Products or licensing efforts with any third parties.

33. On information and belief, Bio-Rad has purposely withheld details about its commercialization efforts (especially as to products that "may be determined to be Licensed Products") in a bad-faith effort to deceive Brandeis and avoid paying royalties.

34. Publicly available materials reflect Bio-Rad's sustained investment in droplet microfluidic platforms and consumables directed to the same field and uses as the Licensed IP,[6] while Bio-Rad has refused to designate any Licensed Products or pay royalties.

35. On information and belief, Bio-Rad elected product configurations and commercialization priorities to avoid claim-triggering implementations despite technical feasibility and market demand for implementations that would practice the Licensed IP, thereby unreasonably exercising its reasonable discretion under Section 3.1 and frustrating the Agreement's royalty bargain.

    **B.    The 10X Genomics Litigation and the Cross License**

36. Per Sections 6.1 and 6.3 of the Agreement, Bio-Rad is required to inform Brandeis of any "harmful or wrongful activities of third parties" with respect to the licensed IP, and any intent to enforce the Licensed IP against infringers. Per Section 6.4 of the Agreement, Bio-Rad must obtain Brandeis' consent before settling any such dispute.

37. Bio-Rad has been involved in extensive litigation with competitors in the field of microfluidics in recent years. *See, e.g., Bio-Rad Laboratories, Inc.* v. *10X Genomics*, Civil Action No. 19-CV-12533-WGY, 2020 WL 2079422 (D. Mass. Apr. 30, 2020).

---

[6] *See, e.g.*, https://investors.bio-rad.com/press-releases/news-details/2025/Bio-Rad-Offers-to-Acquire-Digital-PCR-Developer-Stilla-Technologies/default.aspx.

38. On or around July 26, 2021, Bio-Rad entered into a Settlement and Patent Cross License Agreement (the "Cross License") with non-party 10X Genomics, Inc. ("10X Genomics"), settling multiple disputes. A true and correct redacted copy of the Cross License is attached hereto as Exhibit C.

39. The Cross License explicitly references the Agreement, and the Licensed IP, and expressly grants 10X Genomics an option to attain a sublicense in said Licensed IP during the "Term" of the Cross License. Cross License §§ 1.11, 1.12 & 3.1.4.

> 1.11. **"Brandeis Agreement"** means that certain agreement between Brandeis University and Bio-Rad (as successor in interest to RainDance Technologies, Inc.) dated December 22, 2011 related to Brandeis Case 2007-0201.
>
> 1.12. **"Brandeis Patents"** has the same meaning as the definition of "Patent Rights" in the Brandeis Agreement.

> 3.1.4. Subject to the terms and conditions of this Agreement, Bio-Rad hereby grants 10x an option, exercisable by 10x during the Term, to obtain (subject to the applicable terms of the Brandeis Agreement as described in this Section 3.1.4 further below,

40. The Cross License provides that the period "Term" continues "until the expiration of the last surviving patent among the Agreement Patents." Cross License § 8.1.

> 8.1. Term. This Agreement, including the licenses and covenants granted under Section 3.1, Section 3.2 and Section 3.3 of this Agreement, is effective as of the Effective Date and continues (subject to Section 8.2 and Section 8.4) until the expiration of the last surviving patent among the Agreement Patents (such period, the "**Term**").

41. The publicly available Cross License does not include a list of the "Agreement Patents." *See, e.g.*, Exhibit C at 39.

> **Exhibit 1.3 – 10x Patents**
>
> [\*\*\*]

42. Without a complete list the Agreement Patents, it is impossible to determine when the Cross License's "Term" ends as this period depends on the patent expiration dates.

43. On information and belief, Bio-Rad intended to assert and use the Licensed IP in negotiating leverage in the 10X Genomics litigation, which triggered Section 6.3's notice duty.

44. 10X Genomics received the option right to sublicense the Licensed IP as a bargained for benefit.

45. Bio-Rad never consulted with Brandeis nor obtained its consent before entering into the Cross License as required by Section 6.4 of the Agreement.

46. The details of the consideration received by Bio-Rad are redacted; however, Bio-Rad publicly claimed to have received $31.6 million as royalty revenue "related to an intellectual property litigation settlement" [7] in the same period when the Cross License was executed.

47. Even if Bio-Rad had received no monetary compensation for the option, Bio-Rad had a duty to assign a fair market value to *anything* it received in exchange for the Cross License and report such exchange to Brandeis pursuant to Section 2.2.2 of the Agreement.

48. Bio-Rad never disclosed the existence of the Cross License or otherwise included the 10X Genomics "option" in any reports submitted to Brandeis.

49. On information and belief, Bio-Rad chose to offer the Licensed IP as an "option" in exchange for valuable consideration to avoid payment of royalties to Brandeis.

50. Brandeis became aware of the Cross License through its own administrative audit process in 2024.

---

[7] BIO-RAD LABORATORIES, INC. Q3 2021 FORM 10-Q at 35, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000012208/000001220821000050/bio-20210930.htm ("[D]uring the third quarter of 2021, we recorded $31.6 million of royalty revenue related to an intellectual property litigation settlement that pertained to the sales of infringing products that occurred during the period from November 2018 through July 2021.").

51. Also in 2024, Brandeis became aware that Bio-Rad was marketing several products that produce miniscule fluid droplets of precise size, such as the Automated Droplet Generator, QX100 Droplet Generator, and QX200 Droplet Generator ("Droplet Generators").

52. Bio-Rad's promotional and instructional materials show close similarities between the methods and structures used in the Droplet Generators and the methods and structures described in the Licensed IP.

53. Brandeis also became aware that 10X Genomics markets products that use similar technology to perform cell partitioning for medical testing, such as the Chromium Controller.

54. On information and belief, Bio-Rad's Droplet Generators and 10X Genomics' Chromium Controller, among others, likely practice the Licensed IP and are Licensed Products.

C. **Bio-Rad's Refusal to Cooperate with Brandeis' Contractually Permitted Audit**

55. The above events led Brandeis to believe that Bio-Rad was violating the terms of the Agreement, prompting Brandeis to exercise its rights under Section 4.4 of the Agreement to review Bio-Rad's books, ledgers, and records.

56. On July 30, 2024, Brandeis engaged Mr. Doug Aguilera, an independent auditor, to examine Bio-Rad's books, ledgers, and records. Mr. Aguilera is a licensed Certified Public Accountant (CPA), Certified Forensic Accountant (CFF), and Certified Fraud Examiner (CFE) with over 30 years of global accounting services expertise.[8]

57. On September 3, 2024, Brandeis sent Bio-Rad an audit notification letter (the "Audit Notification") providing the 14-day written notice required by Section 4.4 of the Agreement and formally requesting access to certain Bio-Rad information and documents. A true and correct copy of Brandeis' notice is attached hereto as Exhibit D.

---

[8] https://www.aguileraassociates.com/about; https://www.linkedin.com/in/dougaguilera/.

58. The Audit Notification identified several "Audit Products," including the Droplet Generators, requesting that Bio-Rad produce technical data and sales information regarding same. *Id*. This data was within the scope of Brandeis' audit rights, as it was for the purpose of and necessary to verify Bio-Rad's Annual Reports regarding its commercialization efforts. Agreement §§ 3.2, 4.4; Exhibit B.

59. The Audit Notification also requested information regarding the Cross License, which was for the purpose of and necessary to verify Bio-Rad's Annual Reports regarding its licensing efforts. Agreement §§ 3.2, 4.4; Exhibit B.

60. Information regarding both the Audit Products and the Cross License was also necessary to verify whether Bio-Rad's withholding of any royalty information per Section 4.5 of the Agreement was proper.

61. On October 1, 2024, Mr. Aguilera met with Bio-Rad to discuss the proposed conduct of the review. At the meeting, Bio-Rad claimed that it did not utilize or sublicense the Licensed IP, nor manufacture Licensed Products. Bio-Rad also claimed that it was under no obligation to cooperate with Mr. Aguilera's audit because it did not produce Licensed Products.

62. After months of back and forth, Bio-Rad refused to provide the necessary information and documentation required under the audit provision of the Agreement, including financial information and details related to its settlement with 10X Genomics, and continues to thwart Mr. Aguilera's audit attempts.

63. Consequently, on November 21, 2024, Brandeis sent Bio-Rad a formal notice

pursuant to Section 9.1 of the Agreement, informing Bio-Rad of its various material breaches of the Agreement, including (among others) Bio-Rad's refusal to provide the requested information and permit the audit.[9]

64. Despite the formal notice, Bio-Rad has failed to cure the identified breaches.

65. On information and belief, Bio-Rad is purposely evading its audit responsibilities under the Agreement to conceal evidence that it is producing Licensed Products.

## COUNT I – BREACH OF CONTRACT

66. Brandeis re-alleges the allegations above as if set forth herein.

67. The parties agreed to the valid and binding Agreement, through which Bio-Rad received a license to make, have made, use, sell and offer for sale Licensed Products.

68. In exchange, Brandeis received royalty rights, audit rights, access to Bio-Rad's records, and Bio-Rad's promise to, among other things, use commercially reasonable best efforts to develop and make available Licensed Products.

69. Brandeis has complied with its contractual obligations under the Agreement by permitting Bio-Rad to use the Licensed IP subject to the terms of the Agreement.

70. Bio-Rad's refusal to allow Brandeis access to the requested books, ledgers, and records is a breach of Section 4.4 of the Agreement.

71. Bio-Rad's failure to promptly report the Cross License or the consideration it received for the Cross License is a breach of Section 2.2 of the Agreement.

72. Bio-Rad's failure to inform Brandeis of its intent to enforce the Licensed IP against 10X Genomics is a breach of Section 6.3 of the Agreement.

73. Bio-Rad's failure to obtain Brandeis' consent before entering into the Cross License

---

[9] Attached hereto as Exhibit E is a true and correct copy of Brandeis' breach notice, which has been filed under seal pursuant to the Court's Order dated October 9, 2025.  See ECF No. 17.

is a breach of Section 6.4 of the Agreement.

74.     If Bio-Rad's assertion that it has not made any sales of Licensed Products is accurate, it has breached its obligation to use commercially reasonable best efforts to market the Licensed IP per Section 3.1 of the Agreement. Indeed, for nearly a decade, Bio-Rad has not taken any actions to develop and market the Licensed IP. If any evidence of such activities exists, Bio-Rad refuses to provide it to the auditor for review—another flagrant breach of the Agreement.

75.     On information and belief, rather than commercializing products it deemed to be Licensed Products, Bio-Rad chose to commercialize allegedly alternative competing products in an effort to avoid paying earned royalties to Brandeis. For example, Bio-Rad continues to invest heavily in droplet technology. In July 2025, Bio-Rad acquired Stilla Technologies and introduced new platforms like the QX Continuum and QX700 series.[10] In failing to commercialize the Licensed Products throughout the term of the Agreement, Bio-Rad continues to breach Section 3.1 of the Agreement.

76.     A breach of Section 3.1 is an express material breach entitling Brandeis to terminate the Agreement. Agreement § 9.1.

77.     Alternatively, if Bio-Rad has sold Licensed Products and has concealed such, it has breached its obligations to report such sales and pay royalties to Brandeis per Sections 4.1 and 4.5 of the Agreement.

78.     Brandeis requests specific performance of the records and audit provision.

79.     Brandeis has been damaged by Bio-Rad's breaches including, *inter alia*, by not receiving royalties flowing from the commercializing of Licensed Products, by not receiving the

---

[10] *See, e.g.*, https://investors.bio-rad.com/press-releases/news-details/2025/Bio-Rad-Expands-Droplet-Digital-PCR-Offering-Through-Strategic-Acquisition-and-Platform-Rollout/default.aspx

required records and audit, and by being forced to hire the undersigned and a professional auditor to prosecute its rights under the Agreement.

80. To the extent Bio-Rad's reporting is accurate because Bio-Rad has not sold any Licensed Products, Brandeis seeks compensatory damages for Bio-Rad's failure to commercialize the License Products in violation of Section 3.1 of the Agreement.

81. Brandeis additionally seeks its damages in obtaining the requested records and audit in an amount to be proved at trial.

## COUNT II – DECLARATORY JUDGMENT

82. Brandeis re-alleges the allegations above as if set forth herein.

83. The parties agreed to the valid and binding Agreement, through which Bio-Rad received a license to make, have made, use, sell and offer for sale Licensed Products.

84. In exchange, Brandeis received royalty rights, audit rights, access to Bio-Rad's records, and Bio-Rad's promise to, among other things, use commercially reasonable efforts to develop and make available Licensed Products.

85. Bio-Rad has refused to permit the requested audit as required by Section 4.4 of the Agreement.

86. Brandeis seeks a declaration that Bio-Rad is required to provide access to its books, ledgers, and records for all potential Licensed Products, including all services and other fees otherwise related to potential Licensed Products and Bio-Rad's efforts to bring Licensed Products to market.

87. A declaratory judgment is required so as to guide the parties in their future relationship.

88. As reflected in the Agreement, Brandeis has a definite legal interest in the Licensed IP and the possible royalties (or lack thereof) generated by Bio-Rad's commercialization of the Licensed IP. Bio-Rad has a similar legal interest in its right to develop and sell Licensed Products.

89. By denying Brandeis access to its books, ledgers, and records, Bio-Rad is denying Brandeis' assertion of its legal rights under Section 4.4 of the Agreement.

90. Per Section 4.4 of the Agreement, Bio-Rad's assertion that it does not sell Licensed Products is not a condition precedent to Brandeis' right to review Bio-Rad's books, ledgers, and records.

91. Under these circumstances, Bio-Rad's continued denial of Brandeis' assertion of its legal rights will almost immediately and inevitably result in continued litigation.

92. An actual controversy exists therefore between the parties over construction and execution of the Agreement.

93. The determination of contractual rights is a proper subject for declaratory judgment in Massachusetts.

94. Brandeis will suffer hardship absent a declaration by this Court construing and enforcing the Agreement, and has suffered an injury-in-fact for Bio-Rad's refusal to permit the required audit.

95. Brandeis additionally seeks its damages in obtaining a declaration regarding the audit in an amount to be proved at a post-judgment hearing and after the Court's declaration of Brandeis' rights under the Agreement.

**COUNT III – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

96. Brandeis re-alleges the allegations above as if set forth herein.

97. Bio-Rad's knowing refusal to comply with its contractual obligations, including by blocking access to its books, ledgers, and records as required by Section 4.4 of the Agreement, is a breach of the implied covenant of good faith and fair dealing by preventing performance of the Agreement or alternatively withholding Brandeis' right to receive the benefits of the Agreement. Bio-Rad's bad-faith behavior can be inferred from the circumstances described above.

98. A duty of good faith and fair dealing is implicit in all contracts under Massachusetts law and implied in the performance and enforcement of every term of an express contract.

99. By repeatedly engaging in practices that deprived Brandeis of its contractual rights, such as (i) structuring the Cross License to embed a present, exercisable sublicense option "subject to" Brandeis' agreement while withholding required reports and records; (ii) refusing any allocation or reporting of consideration attributable to the option under Section 2.2.2 of the Agreement; (iii) blocking or stonewalling the audit despite narrowed, contract-tethered requests; (iv) leveraging the Licensed IP to extract value from 10X Genomics while denying Brandeis consent and participation; and (v) refusing to designate Licensed Products while commercializing droplet products, systems, and platforms in the field,[11] Bio-Rad has continually shown bad faith in performing the terms of the Agreement.

100. As a result of Bio-Rad's failure to abide by its obligations and promises, Brandeis has been damaged in an amount to be proved at a post-judgment hearing.

## COUNT IV – VIOLATION OF M.G.L. CH. 93A § 2

101. Brandeis re-alleges the allegations above as if set forth herein.

---

[11] *See, e.g.*, https://investors.bio-rad.com/press-releases/news-details/2025/Bio-Rad-Offers-to-Acquire-Digital-PCR-Developer-Stilla-Technologies/default.aspx (declaring Bio-Rad made "$2.6 billion in revenues in 2024.").

102. Bio-Rad's breaches, especially given Brandeis' requests for records, are malicious, willful, reckless, wanton, or in bad faith.

103. Additionally, Bio-Rad's surreptitious "option" to 10X Genomics as valuable consideration without reporting the same to Brandeis or paying Brandeis any royalties, and Bio-Rad's refusal to cooperate with Brandeis' audit request under the guise of not selling any Licensed Products are deceptive acts.

104. Through its conduct, Bio-Rad knowingly breached the Agreement with the intention of securing benefits not owing to it under the Agreement.

105. The unfair and deceptive acts occurred primarily and substantially in Massachusetts.

106. The Agreement selects Massachusetts courts.

107. Brandeis' licensing program and audit administration are based in Waltham, Massachusetts.

108. The audit notice issued from Massachusetts.

109. Bio-Rad directed performance and non-performance into Massachusetts, such as delivery of required progress reports and payment of Agreement related fees.

110. Brandeis' injury to its Massachusetts-administered royalty stream and audit rights was felt in Massachusetts.

111. Bio-Rad's concealment of settlement consideration related to the Licensed IP pursuant to the option right and Bio-Rad's refusal to honor the audit and reporting obligations were unethical and unscrupulous.

112. Brandeis has suffered damage as a result of Bio-Rad's conduct, including monetary damages that cannot be accurately determined absent access to Bio-Rad's books, ledgers, and records.

### **PRAYER FOR RELIEF**

Brandeis respectfully requests that judgment be entered in its favor against Bio-Rad and that the Court grant the following relief:

a. Damages for Bio-Rad's failure to use reasonable efforts to commercialize the Licensed IP in accordance with Section 3 of the Agreement;

b. Damages for Bio-Rad's failure to pay royalties, if the audit shows that unpaid royalties are owed;

c. An Order requiring Bio-Rad to specifically perform its contractual obligations under Section 4.4. of the Agreement, including but not limited to providing all information requested in Brandeis' September 3, 2024 Audit Notification;

d. A declaratory judgment as set forth in Count II above;

e. Pre- and post-judgment interest;

f. Reasonable costs and attorneys' fees; and

g. Such other relief as the Court may deem just and proper, in law or in equity.

### **JURY DEMAND**

Brandeis hereby requests a trial by jury.

Dated: November 7, 2025

Respectfully Submitted,

**BRANDEIS UNIVERSITY**,
By its attorneys,

/s/ *Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
Melanie Stallone (BBO #711658)
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
Telephone: (617) 481-0160
dcloherty@clohertysteinberg.com
mstallone@clohertysteinberg.com

Alfonso Garcia Chan*
Halima Shukri Ndai**
CAHILL GORDON & REINDEL LLP
900 16th Street, N.W., Suite 500
Washington, DC 20006
Telephone: (202) 862-8900
achan@cahill.com
hndai@cahill.com

Aaron Dettman*
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
adettman@cahill.com

*Leave to appear pro hac vice granted on October 21, 2025*

**Leave to appear pro hac vice granted on October 24, 2025*

Attorneys for Plaintiff Brandeis University

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document was filed on November 7, 2025 through the Court's ECF system and will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

/s/ *Melanie Stallone*
Melanie Stallone