IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BRANDEIS UNIVERSITY, | |
| Plaintiff, | Civil Action No. 1:25-cv-12780 |
| v. | ORAL ARGUMENT REQUESTED |
| BIO-RAD LABORATORIES, INC. | |
| Defendant. | |

**DEFENDANT BIO-RAD LABORATORIES, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS
<u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ....................................................................................................... 1

II.  FACTUAL BACKGROUND ....................................................................................... 1

    A.   Bio-Rad Laboratories, Inc. ................................................................................. 1

    B.   Brandeis License Agreement .............................................................................. 2

    C.   Bio-Rad's Litigation Against 10x Genomics ...................................................... 3

    D.   Brandeis's Audit Request ................................................................................... 4

    E.   Brandeis's Amended Complaint ......................................................................... 5

III. LEGAL STANDARD ................................................................................................ 6

IV.  ARGUMENT ............................................................................................................. 7

    A.   The Amended Complaint Fails To State A Claim For Breach of Contract (Count I)...... 7

        1.   The Amended Complaint fails to state a claim that Bio-Rad's products are "Licensed Products" to which Sections 4.1 and 4.5 apply ................................. 7

        2.   The Amended Complaint fails to state a claim that Sections 6.3 and 6.4 apply to Bio-Rad's Cross-License Agreement with 10x .................................................. 10

        3.   The Amended Complaint fails to state a claim that Bio-Rad engaged in sublicensing activity to which Section 2.2 applies ............................................... 11

        4.   The Amended Complaint fails to state a claim that Bio-Rad failed to use commercially reasonable best efforts under Section 3.1 ..................................... 12

        5.   The Amended Complaint fails to state a claim that Bio-Rad has breached Section 4.4................................................................................................................... 14

    B.   The Amended Complaint Fails to State a Claim For Declaratory Judgment (Count II) 16

    C.   The Amended Complaint Fails to State a Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III) ........................................................... 16

    D.   Brandeis's Claim for Violation of M.G.L. Ch. 93A § 2 Fails as a Matter of Law (Count IV)............................................................................................................... 18

V.   CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................................6, 13

*Bot M8 LLC v. Sony Corp. of Am.,*
4 F.4th 1342 (Fed. Cir. 2021) ........................................................................................7

*Browder v. Ojikutu,*
No. 1:24-CV-11588-AK, 2025 WL 2379682 (D. Mass. Aug. 15, 2025) ...........7, 13

*Cheng v. Neumann,*
51 F.4th 438 (1st Cir. 2022) ...........................................................................................6

*CrunchTime! Info. Sys., Inc. v. Frischs Restaurants, Inc.,*
768 F. Supp. 3d 183 (D. Mass. 2025) ..........................................................................19

*Daniels v. Alvaria, Inc.,*
No. 23-CV-10419-DJC, 2024 WL 758172 (D. Mass. Feb. 23, 2024) ...........................6

*Douglas v. Hirshon,*
63 F.4th 49 (1st Cir. 2023) .........................................................................................6, 8

*Elan Microelectronics Corp. v. Apple, Inc.,*
No. C 09-01531 RS, 2009 WL 2972374 (N.D. Cal. Sept. 14, 2009) .............................9

*Endobotics, LLC v. Fujifilm Healthcare Ams. Corp.,*
No. 24-CV-2266 (NSR), 2025 WL 1549027 (S.D.N.Y. May 29, 2025) ........................8

*Evergreen Adhesives, Inc. v. 3M Co.,*
No. CV 22-10821-GAO, 2023 WL 5651875 (D. Mass. Aug. 31, 2023) ........................8

*Monahan Prods. LLC v. Sam's E., Inc.,*
463 F. Supp. 3d 128 (D. Mass. 2020) ..........................................................................20

*Neural Magic, Inc. v. Meta Platforms, Inc.,*
659 F. Supp. 3d 138 (D. Mass. 2023) ..........................................................................19

*NextSun Energy Littleton, LLC v. Acadia Ins. Co.,*
494 F. Supp. 3d 1 (D. Mass. 2020) ..............................................................................17

*Progenics Pharms., Inc. v. MIM Software Inc.,*
762 F. Supp. 3d 100 (D. Mass. 2025) ............................................................................8

ii

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*,
  842 F. Supp. 2d 502 (S.D.N.Y. 2012) ...................................................................................12

*Talk Radio Network Enters. v. Cumulus Media Inc.*,
  271 F. Supp. 3d 1195 (D. Or. 2017) .....................................................................................14

*Tendyne Holdings, Inc. Securityholders' Representative Comm. v. Abbott
  Vascular, Inc.*,
  No. CV 18-1070-CFC, 2019 WL 2717857 (D. Del. June 28, 2019) ......................................14

*Waleyko v. Phelan*,
  146 F.4th 89 (1st Cir. 2025) ....................................................................................................6

*Zotbelle, Inc. v. Kryolan Corp.*,
  416 F. Supp. 3d 33 (D. Mass. 2019) ..................................................................................16, 17

**Statutes**

M.G.L. Ch. 93A § 2 ..........................................................................................................................18

M.G.L. Ch. 93A § 11 ........................................................................................................................19

**Other Authorities**

FRCP 12(b)(6) ............................................................................................................................1, 6

## I.     <u>INTRODUCTION</u>

Brandeis's First Amended Complaint ("Amended Complaint") does nothing to remedy the deficiencies in its original Complaint and presents a series of disconnected allegations that, even if presumed true, fail to state a claim upon which relief can be granted.  Brandeis's allegations relate to a License Agreement (the "Agreement") granting Bio-Rad rights to certain Brandeis-owned patents and patent applications.  The Agreement governs the parties' conduct only as it relates to the licensed patent rights; the Agreement does not grant Brandeis any rights to reach into Bio-Rad's other business or activity.  Brandeis's Amended Complaint targets activity that has no relation to Brandeis's patents and triggers no obligations under the Agreement.  The Amended Complaint fails to plead facts that could support the applicability of any contractual duty owed to Brandeis, and should therefore be dismissed under Rule 12(b)(6).

## II.     <u>FACTUAL BACKGROUND</u>

### A.     **Bio-Rad Laboratories, Inc.**

Bio-Rad is a global leader in developing and manufacturing innovative products for life sciences research and clinical diagnostics.  Among other things, Bio-Rad offers several products for droplet digital polymerase chain reaction ("PCR").  PCR is a laboratory technique used to analyze genetic material in samples—for example, detecting whether a nasal swab sample includes genetic material of the virus that causes COVID.  Droplet digital PCR is an advanced method of PCR that uses microfluidics and droplet technology to measure target molecules directly with high sensitivity even when sample sizes are extremely limited.  This technology has a number of applications in fields such as cancer research and infectious disease, environmental testing, and food testing, among others.  Bio-Rad has marketed its droplet digital PCR systems for over a decade, following its 2012 acquisition of droplet digital PCR company QuantaLife, Inc.

**B.      Brandeis License Agreement**

In 2017, Bio-Rad acquired RainDance Technologies, Inc. ("RainDance").  As part of that acquisition, Bio-Rad inherited the 2011 License Agreement between Brandeis and RainDance that is the subject of Brandeis's Amended Complaint.  (*See* Doc. No. 46 ¶¶ 15–17; Doc. No. 46-1.) The Agreement concerns Brandeis-owned patents and patent applications, including the two patents identified in the Amended Complaint, which relate to methods of using microfluidic networks: U.S. Patent No. 8,595,221 and U.S. Patent No. 8,772,046 (together, the "Brandeis patents" or "licensed patents").

The Agreement grants Bio-Rad the freedom to use—and to exclude others from using— the methods claimed in the licensed patents.  Under Section 2.2 of the Agreement, Bio-Rad is entitled to grant sublicenses to those patents freely, so long as any sublicense carries the same royalty and reporting terms that apply to Bio-Rad.  (*See* Doc. No. 46-1 § 2.2.1.)  Bio-Rad has no obligation to notify Brandeis of any sublicense prior to execution, but must promptly provide Brandeis a copy of the "fully executed sublicense agreement[]" and account for any sublicensee's royalty obligations in its reports to Brandeis.  (*Id.*)  Under Section 6 of the Agreement, Bio-Rad has the first right (but no obligation) to enforce the licensed patents against suspected infringers, at its own expense.  (*Id.* § 6.3.)  If Bio-Rad seeks to enforce the licensed patents in an infringement suit, it must provide advance notice to Brandeis.  (*Id.*)  If Bio-Rad engages in an infringement suit asserting the Brandeis patents against a suspected infringer, it must obtain Brandeis's consent before settling that action, "which consent shall not unreasonably be withheld, delayed or conditioned."  (*Id.* § 6.4.)

The financial terms of the Agreement are simple.  In return for granting the license, Brandeis received lump-sum license fees upon issuance of the licensed patents.  (Doc. No. 46-1, Ex. A § A.2.)  Brandeis is also entitled to receive a percentage royalty on net sales of any "Licensed

Products" practicing the licensed patents—*i.e.*, products sold by RainDance/Bio-Rad that would "infringe" the licensed patents absent the license granted in the Agreement. (*Id.* § 4.1; *Id.*, Ex. A § A.1.) Section 3 of the Agreement acknowledges that the "first commercial sale of a Licensed Product" had not happened at the time of the Agreement (and therefore RainDance/Bio-Rad did not yet have any royalty obligations to Brandeis). (*See id.* § 3.1.) Section 3 requires Bio-Rad to "use commercially reasonable best efforts to develop and make commercially available Licensed Products" where "[c]ommercially reasonable efforts shall be determined by Licensee in its reasonable discretion." (*Id.*) It further provides that if there are still no commercial products practicing the licensed patents after five years, RainDance/Bio-Rad would owe Brandeis a "commercialization milestone" payment. (*Id.*)

To track Bio-Rad's compliance with its royalty obligations, the Agreement requires Bio-Rad to provide a financial accounting for any commercial products that practice the licensed patents, and to maintain "records" of any royalty-bearing sales. (Doc. No. 46-1 § 4.4.) The Agreement provides Brandeis a limited right of verification to examine those records for the purpose of auditing Bio-Rad's royalty calculations. (*Id.*) It does not provide Brandeis a discovery right to Bio-Rad's confidential or proprietary technical information or financial information for products not related to Brandeis's patents. (*See id.*)

### C.    Bio-Rad's Litigation Against 10x Genomics

Bio-Rad has an extensive portfolio of its own patents and holds exclusive licenses to other patents under agreements with entities besides Brandeis. Bio-Rad has asserted some of those patents in infringement actions having nothing to do with Brandeis or the Brandeis patents. Several of those infringement actions have been against competitor 10x Genomics ("10x"). In 2021, Bio-Rad and 10x entered a settlement agreement resolving the multiple patent infringement actions then pending between the parties. As part of the settlement agreement (a public version of which

is attached to Brandeis's Amended Complaint as Exhibit C (Doc. No. 46-3)) ("10x Cross-License Agreement"), Bio-Rad and 10x granted each other a non-exclusive, worldwide, royalty-bearing license under their respective patent portfolios in certain fields.  Each party also covenanted not to sue the other with respect to certain patents controlled by each party—expressly excepting the Brandeis patents among others—and mutually released their pending claims against each other. (Doc. No. 46-3 § 3.3.)

Bio-Rad did not include the Brandeis patents in the cross-license, the mutual release, or the covenant not to sue with 10x.  In a separate provision at Section 3.1.4 of the 10x Cross-License Agreement, Bio-Rad granted 10x an "***option***" to obtain—"subject to the applicable terms of the Brandeis Agreement"—a non-exclusive, royalty-bearing sublicense under the Brandeis patents. (Doc. No. 46-3 § 3.1.4 (emphasis added).)  To exercise the option, 10x must provide notice to Bio-Rad and then enter into a separate sublicense agreement consistent with the terms of the Brandeis Agreement.  (*Id.*)  To date, 10x has not exercised its option to enter a sublicense agreement for the Brandeis patents.

### D.    Brandeis's Audit Request

In September 2024, Brandeis informed Bio-Rad that it had "selected [the Bio-Rad/Brandeis License Agreement] for audit" under its "licensing income auditing program."  (Doc. No. 46-4 at 1.)  Brandeis requested confidential, proprietary technical documents and financial records for products that Bio-Rad has sold since before it entered the Brandeis Agreement.  (*See id.*)  Brandeis did not indicate why it thought the requested documentation was relevant to the Agreement, or how its selected accounting firm would use the technical information requested.  (*Id.*)  When Bio-Rad refused to provide the requested information, Brandeis sent a letter accusing Bio-Rad for the first time of breaching the Agreement.  (*See* Doc. No. 46-5.)  In response, Bio-Rad explained again that Bio-Rad does not have any commercial products that practice the Brandeis patents, including

with reference to claim charts showing how the identified products do not practice the Brandeis patents (and, in the case of one product, has not been sold since 2013).

### E.    Brandeis's Amended Complaint

Brandeis filed its original Complaint in September 2025, after several communications in which Bio-Rad explained its products do not practice the Brandeis patents.  After nearly a year of silence, Brandeis filed its Complaint in Massachusetts state court.  Bio-Rad then removed the case to this Court (Doc. No. 1).  Following Bio-Rad's first motion to dismiss for failure to state a claim (Doc No. 33), Brandeis filed a First Amended Complaint.  (Doc No. 46.)

The Amended Complaint alleges the same four theories of relief set forth in the original complaint.  All four theories require a factual premise, underlined below:

1.  <u>Bio-Rad sells products covered by the Brandeis patents</u> and therefore owes royalties on those products;

2.  <u>There have been opportunities for Bio-Rad to commercialize the Brandeis patents, which Bio-Rad has elected not to pursue</u>, resulting in lost royalty opportunities for Brandeis;

3.  <u>The technical and financial records Brandeis has requested to audit are related to Licensed Products</u>; and

4.  <u>Bio-Rad asserted the Brandeis patents in an infringement suit against 10x and sublicensed the Brandeis patents to 10x</u> and therefore owed Brandeis notice obligations concerning the infringement suit and the sublicense.

* * *

Brandeis fails to plead the factual premises that are necessary preconditions to its claims, and therefore fails to state any claim on which relief can be granted.  The Amended Complaint should therefore be dismissed.

## III.  **LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Amended Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; *see also Waleyko v. Phelan*, 146 F.4th 89, 95 (1st Cir. 2025) ("The make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.") (internal quotation marks and citation omitted).  Although a court must "'accept as true the complaint's well-pleaded factual allegations' and 'draw all reasonable inferences in favor of the non-moving party,'" *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) (quoting *McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017)), it does not credit "'conclusory legal allegations' [or] factual allegations that are 'too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture,'" *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023) (quoting *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33 (1st Cir. 2022)).  "Interpretation of an unambiguous contract is a matter of law and may, therefore, be done at the motion to dismiss stage."  *Daniels v. Alvaria, Inc.*, No. 23-CV-10419-DJC, 2024 WL 758172, at *5 (D. Mass. Feb. 23, 2024).

## IV.    ARGUMENT

### A.    The Amended Complaint Fails To State A Claim For Breach of Contract (Count I)

#### 1.    The Amended Complaint fails to state a claim that Bio-Rad's products are "Licensed Products" to which Sections 4.1 and 4.5 apply

Brandeis claims either that Bio-Rad has breached its royalty obligations under Sections 4.1 and 4.5 of the Agreement because it sells products that allegedly practice the Brandeis patents OR that Bio-Rad has breached its obligation to use commercially reasonable efforts under Section 3.1 because its products *do not* practice the Brandeis patents.  (Doc. No. 46 ¶¶ 56, 58.)  The Amended Complaint fails to plead facts sufficient to proceed under either of these contradictory theories. Brandeis alleges both opposing theories on the basis of "information and belief" but fails to plead any facts that could support a belief that either theory is plausibly true.  (*See id.* ¶¶ 54, 75.)  Both theories must therefore be dismissed.  *See Browder v. Ojikutu*, No. 1:24-CV-11588-AK, 2025 WL 2379682, at *6–7 (D. Mass. Aug. 15, 2025) (failure to include specific factual allegations that could make an inference of liability plausible requires dismissal).

Sections 4.1 and 4.5 apply only to "Licensed Products": Bio-Rad is required to pay a royalty only on sales of "Licensed Products" (4.1) and to report sales information for only "Licensed Products" (4.5).  The Agreement defines "Licensed Products" as "any composition or method" that "absent the licenses granted" in the Agreement would "infringe" the licensed patents. (Doc. No. 46-1 § 1.6; Doc. No. 46 ¶ 20.)  A claim for breach of contract based on Sections 4.1 and 4.5 therefore requires that Bio-Rad sells products that "infringe" the licensed patents. (*Id.*)  To allege that Bio-Rad infringes the licensed patents, Brandeis must plead "factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim."  *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021); *see also id.* ("[A]

7

plaintiff cannot assert a plausible claim for infringement under the *Iqbal/Twombly* standard by reciting the claim elements and merely concluding that the accused product has those elements.").

Brandeis's Amended Complaint falls far short of that standard. It fails even to recite or describe the claims of the licensed patents, or how any aspect of any Bio-Rad product could plausibly infringe those claims. Instead, the Amended Complaint identifies three Bio-Rad products that it speculates—without factual basis—"likely practice the Licensed IP": the Automated Droplet Generator, the QX100 Droplet Generator,[1] and the QX200 Droplet Generator (together, the "Droplet Generators"). (Doc. No. 46 ¶¶ 51, 54.) The Amended Complaint pleads a single conclusory assertion that "Bio-Rad's promotional and instructional materials show close similarities between the method and structures used in the Droplet Generators and the methods and structures described in the Licensed IP." (*Id.* ¶ 52.) That bare assertion is precisely the type of allegation that is "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Douglas*, 63 F.4th at 55 (internal quotation marks omitted) (quoting *Legal Sea Foods*, 36 F.4th at 33).

The Complaint fails to plead any factual allegation that could put Bio-Rad on notice of what aspect of the identified products could plausibly be "similar" to or meet the limitations of any claim of the licensed patents. That failure requires dismissal. *See, e.g.*, *Progenics Pharms., Inc. v. MIM Software Inc.*, 762 F. Supp. 3d 100, 117 (D. Mass. 2025) (dismissing infringement claim where complaint failed to make allegations as to how the accused product met the claims); *Evergreen Adhesives, Inc. v. 3M Co.*, No. CV 22-10821-GAO, 2023 WL 5651875, at *2 (D. Mass. Aug. 31, 2023) (same); *see also, e.g.*, *Endobotics, LLC v. Fujifilm Healthcare Ams. Corp.*,

---

[1] Bio-Rad stopped marketing the QX100 Droplet Generator in 2013—a fact Bio-Rad communicated to Brandeis in pre-suit discussions and noted again in its first motion to dismiss.

No. 24-CV-2266 (NSR), 2025 WL 1549027, at *2 (S.D.N.Y. May 29, 2025) ("stating that 'upon information and belief' the Accused Products contains [sic] the [Asserted] Patents material claims is insufficient to satisfy the *Iqbal/Twombly* pleading standard."); *Elan Microelectronics Corp. v. Apple, Inc.*, No. C 09-01531 RS, 2009 WL 2972374, at *2 (N.D. Cal. Sept. 14, 2009) (dismissing infringement counterclaims based on "information and belief," finding that "[w]hile the line between facts and legal conclusions is not always easy to draw, this pleading plainly falls within the prohibition against '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'").

Absent any factual basis to assert that Bio-Rad's publicly commercialized products are "Licensed Products," the Amended Complaint resorts to alleging that Bio-Rad has admitted its products may practice the Brandeis patents. Specifically, Brandeis alleges that Bio-Rad's 2023 progress report to Brandeis "confirms that some of the products Bio-Rad developed and commercialized 'may be determined to be Licensed Products.'" (Doc. No. 46 ¶ 31.) That allegation is egregiously misleading. The actual text of Bio-Rad's progress report—attached as Exhibit B to the Amendment Complaint—tells a very different story. The report shows Bio-Rad informed Brandeis of its continuing efforts to commercialize the licensed patents in *future* products: "Bio-Rad continues to expend resources to develop and commercialize *new* products and services, some of which may be determined to be Licensed Products." (Doc No. 46-2 (emphasis added).) Brandeis's manipulation of that language is insupportable. Nothing in the cited report suggests Bio-Rad's existing products may be Licensed Products. To the contrary, Bio-Rad confirmed in the next line of its progress report that it had not sold any Licensed Products at that time. (*Id.* ("Bio-Rad did not sell Licensed Products during the Accounting Period covered in this report.").) And as Brandeis admits elsewhere in the Amended Complaint, Bio-Rad has

consistently reported at other times that it has never sold Licensed Products.  Brandeis's allegation that Bio-Rad has suggested otherwise fails on its face.

Without a plausible allegation that Bio-Rad's products are "Licensed Products" covered by the licensed patents, Brandeis's claim for royalty payments and reports on those products collapses.  Brandeis's claims for breach of Sections 4.1 and 4.5 in Count I of the Amended Complaint should therefore be dismissed.

2.    The Amended Complaint fails to state a claim that Sections 6.3 and 6.4 apply to Bio-Rad's Cross-License Agreement with 10x

Brandeis asserts that Bio-Rad breached Sections 6.3 and 6.4 of the Agreement when it entered the 10x Cross-License Agreement (Doc. No. 46-3).  Sections 6.3 and 6.4 of the Agreement impose obligations on Bio-Rad only under certain conditions—*i.e.*, when Bio-Rad intends to file suit asserting the Brandeis patents, and when Bio-Rad is engaged in an active infringement suit asserting the Brandeis patents.  (*See* Doc. No. 46-1 §§ 6.3, 6.4.)  Brandeis has not plausibly pleaded that those conditions were met.  Its claims for breach of those provisions therefore fail as a matter of law and should be dismissed.

Section 6.3 of the License Agreement requires Bio-Rad to "notify Brandeis of its intent to file suit" asserting the Brandeis patents against a suspected infringer.  (*Id.* § 6.3.)  The Amended Complaint alleges breach of that provision with the following conclusory assertion: "on information and belief Bio-Rad intended to assert and use the Licensed IP in negotiating leverage in the 10X Genomics litigation" (Doc. No. 46 ¶ 43).  The Amended Complaint fails to support that conclusory allegation with any facts.  The only facts pleaded tend to show the opposite:  Bio-Rad entered a cross-license with 10x regarding litigation on other patents, in which Bio-Rad asserted—and 10x took a license to—other patents having nothing to do with Brandeis.  Bio-Rad also covenanted not to sue 10x on other patents—but did not make the same promise with respect

10

to the Brandeis patents.  With respect to the Brandeis patents, the 10x Cross-License only confirms Bio-Rad's authority to sublicense the patents under terms of the Brandeis Agreement.  The 10x Cross-License offered 10x "an option to attain a sublicense" to the Brandeis patents.  (Doc. No. 46 ¶¶ 39–41.)  An offer to execute a sublicense at a later date does not indicate that there was any intention to sue 10x on the Brandeis patents.  Brandeis makes no factual assertions—nor could it—that Bio-Rad took any adversarial action against 10x related to any Brandeis patent.  That omission is fatal to Brandeis's claim.  Brandeis cannot state a claim for breach of contract when it has not pleaded any facts plausibly alleging that Bio-Rad owed a contractual duty in the first place.

Section 6.4 of the Agreement likewise applies only in cases where Bio-Rad has actually asserted the Brandeis patents in an infringement suit.  If Bio-Rad is engaged in an active suit asserting infringement of the Brandeis patents, Section 6.4 provides that Bio-Rad must obtain Brandeis's written consent—which "shall not unreasonably be withheld, delayed or conditioned"—before disposing of the litigation by settlement or otherwise.  (Doc. No. 46-1 § 6.4.)  Again, Brandeis fails to plead any facts alleging that Bio-Rad ever asserted the Brandeis patents in an infringement suit against 10x.  Without an infringement suit involving the Brandeis patents, Section 6.4 does not apply, and Bio-Rad cannot have breached an obligation it did not owe.

3.    The Amended Complaint fails to state a claim that Bio-Rad engaged in sublicensing activity to which Section 2.2 applies

Section 2.2 of the Agreement governs Bio-Rad's right to sublicense the Brandeis patents. Under Section 2.2, Bio-Rad can unilaterally grant sublicenses without prior notice to Brandeis, but must provide to Brandeis a copy of any "fully executed sublicense agreement[]" and must require sublicensees to agree to certain royalty and reporting requirements.  (Doc. No. 46-1 § 2.2.)

Brandeis nowhere alleges that Bio-Rad has granted a sublicense to the Brandeis patents. To the contrary, the Amended Complaint admits that Bio-Rad's Cross-License Agreement with

11

10x granted 10x only an option to execute a sublicense at a later date.  (Doc. No. 46 ¶ 39.)  Brandeis does not allege that an offer to sublicense triggers any obligations from Bio-Rad to Brandeis.  Nor can it: the language of Section 2.2 is unambiguous, and applies only to sublicenses—not mere options to sublicense.  For the same reason, Bio-Rad has no obligations to record or report fair market value of any consideration received for an option to sublicense.  (*See id.*; *id.* ¶ 47.)  Brandeis has not pleaded the existence of a sublicense or any condition that would give rise to a contractual obligation on Bio-Rad's part.  On the facts pleaded in the Amended Complaint, there was no duty owed, and therefore no breach.  The Amended Complaint therefore fails to state a claim on which relief can be granted, and Brandeis's claim for breach of contract under Section 2.2 of the Agreement should be dismissed.

4.    <u>The Amended Complaint fails to state a claim that Bio-Rad failed to use commercially reasonable best efforts under Section 3.1</u>

Brandeis asserts that Bio-Rad "has breached its obligation to use commercially reasonable best efforts to market the Licensed IP per Section 3.1 of the Agreement."  (Doc. No. 46 ¶ 74.)  This claim fails on its face because Brandeis pleads no facts to make its conclusion plausible

Brandeis acknowledges that Bio-Rad has confirmed it has "expended effort" to commercialize and sublicense the Brandeis patents.  (*Id.* ¶ 31.)  Brandeis's position is essentially that because there have not yet been sales of Licensed Products, Bio-Rad's efforts must not have been "commercially reasonable" under the Agreement.  (*Id.* ¶ 74.)  But that conclusion does not plausibly follow.  *See, e.g.*, *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 512 (S.D.N.Y. 2012) ("[Plaintiff] relies … on [Defendant]'s lack of success in manufacturing the fuel cells. [Defendant]'s failure to manufacture and supply the cells, however, does not, in and of itself, provide a plausible basis for inferring that [Defendant] acted in bad faith or at a level below its capacities, as would be required to state a plausible claim for breach of a reasonable

12

efforts covenant.").  The Agreement requires commercially reasonable efforts to commercialize a Licensed Product; it does not require success.

The Amended Complaint also alleges that "[o]n information and belief, Bio-Rad elected product configurations and commercialization priorities to avoid claim-triggering implementations despite technical feasibility and market demand for implementations that would practice the Licensed IP."  (Doc. No. 46 ¶¶ 34–35.)  As an initial matter, that is not enough to plead a cognizable claim.  "Courts do not presume the truth of conclusory statements or 'bare assertions' of the law."  *Iqbal*, 556 U.S. at 681.  The words "on information and belief" do not transform Brandeis's allegation into a factual one.  Even "where allegations are based on information and belief, supporting facts on which the belief is founded must be set forth in the complaint." *Browder*, 2025 WL 2379682, at *6–7 (internal quotation marks and citation omitted).  Brandeis pleads no facts that could support an allegation that any Bio-Rad product could have been reconfigured to practice the Brandeis patents, or even that any Bio-Rad product was developed at a time when Bio-Rad was bound by the Brandeis Agreement.  Nor does Brandeis plead any facts that could provide clarity on what "commercialization priorities" Bio-Rad allegedly elected in an alleged attempt to "avoid" the Brandeis patents.

Moreover, even if Brandeis's allegations were factually supported (they are not), they would fail to state a claim of breach under Section 3.1.  The Agreement does not require Bio-Rad to prioritize commercializing the Brandeis patents over Bio-Rad's other products or business interests.  To the contrary, the Agreement expressly grants Bio-Rad sole discretion to determine its own reasonable efforts, and authorizes Bio-Rad to consider its own "business plans" in exercising that broad discretion.  (Doc. No. 46-1 § 3.1 ("Commercially reasonable efforts *shall be determined by Licensee in its reasonable discretion* and may take into account Licensee's size,

finances, and business plans and potential market demand." (emphasis added)).) Brandeis alleges

no facts that could plausibly suggest Bio-Rad exercised its discretion unreasonably. Without

factual allegations to support its conclusion that Bio-Rad "unreasonably exercis[ed] its reasonable

discretion," Brandeis's conclusory assertion is baseless and not entitled to any weight. *See, e.g.*,

*Talk Radio Network Enters. v. Cumulus Media Inc.*, 271 F. Supp. 3d 1195, 1206 (D. Or. 2017)

(failure "to plausibly suggest [alleged] actions were outside the scope of the rights vested to

[Defendant] under the contract" amounts to failure to "plausibly suggest[] [Defendant] acted

unreasonably."). Such a deficient pleading requires dismissal. *See, e.g.*, *id.*; *Tendyne Holdings,*

*Inc. Securityholders' Representative Comm. v. Abbott Vascular, Inc.*, No. CV 18-1070-CFC, 2019

WL 2717857, at *2 (D. Del. June 28, 2019) (dismissing claim where the complaint "contain[ed]

only conclusory assertions that [Defendant] breached the Agreement by failing to use

Commercially Reasonable Efforts").

      5.    <u>The Amended Complaint fails to state a claim that Bio-Rad has breached</u>
<u>Section 4.4</u>

Brandeis alleges that Bio-Rad is required to grant Brandeis access to any information it

requests, and that Bio-Rad's refusal to grant such broad access amounts to a breach of Section 4.4.

(Doc. No. 46 ¶ 70.) But Section 4.4 does not give Brandeis carte blanche to investigate any or all

of Bio-Rad's documents. It provides only that Brandeis can request an audit of Bio-Rad's "books,

ledgers, and records" for a limited purpose, *i.e.*, "for the purpose of and to the extent necessary to

verify any report required under this Agreement." (Doc. No. 46-1 § 4.4.) The "records" Bio-Rad

is required to keep under Section 4.4 are records of Licensed Product sales, which must include

"sufficient detail to enable the royalties payable hereunder to be determined." (*Id.*) Section 4.4

thus limits Brandeis's audit right to records for Licensed Products, for the purpose of verifying Bio-Rad's royalty reports.

Brandeis claims it is entitled also to review extensive technical information (such as "all…technical Documents") for any Bio-Rad product it chooses to probe, to verify progress reports that Bio-Rad provides under a separate section of the Agreement, Section 3.2. (Doc. No. 46-4, Attachment A at 3, § II.1). Section 3.2 ("Progress Reports") requires Bio-Rad to provide periodic reports "detailing its progress or lack of progress" in commercializing the Brandeis patents. (Doc. No. 46-1 § 3.2.) Section 4—where the claimed audit right appears—requires a different type of report. Section 4.5 requires Bio-Rad to provide sales reports for any Licensed Products. Section 4.4 requires Bio-Rad to maintain "records" backing up those reports, and in the same paragraph permits Brandeis to "periodically examine [Bio-Rad's] books, ledgers, and records during regular business hours for the purpose of and to the extent necessary to verify any report required under this Agreement." (Doc. No. 46-1 § 4.5.) It does not entitle Brandeis to demand production of any information it chooses from Bio-Rad, let alone highly technical, proprietary, or competitively sensitive information.

The Amended Complaint fails to plead any facts that could reasonably limit Brandeis's audit request to the scope that is permitted under Section 4.4. To the contrary, the Amended Complaint attaches the actual audit requests (Doc. No. 46-4) showing that Brandeis's requests bear no plausible nexus to verifying Bio-Rad's progress reports—which report no Licensed Products and continuing efforts to develop products that practice the licensed patents. Contrary to Brandeis's assertion that its requests seek information necessary to verify Bio-Rad's "commercialization and licensing efforts," the requests instead seek "technical data and sales information" for products that have nothing to do with Brandeis's patents and confidential

information related to the 10x litigation.  (*See id.*; Doc No. 46 ¶¶ 58–59.)  The Amended Complaint does not even attempt to plead that those requests relate to "Licensed Products" for which Bio-Rad must maintain accounting records for Brandeis's verification.

### B.    The Amended Complaint Fails to State a Claim For Declaratory Judgment (Count II)

Brandeis asks the Court for a "declaration that Bio-Rad is required to provide access to its books, ledgers, and records for all potential Licensed Products."  (Doc. No. 46 ¶ 86.)  The Amended Complaint fails to plead any facts that could state a plausible claim for that relief.  As noted above (*supra* § IV.A.5), the Amended Complaint pleads no factual basis for Brandeis's claim that it is entitled to access any of Bio-Rad's records for any purpose.  Section 4.4 plainly requires that audit requests must be for the limited purpose of verifying reports provided under the Agreement. (Doc. No. 46-1 § 4.4.)  To the extent Brandeis believes there are products that practice the Brandeis patents and for which it should be paid royalties, it has a remedy available—to sue for breach of the royalty provisions, asserting sufficient facts to support that allegation.  Nothing in the Agreement gives Brandeis a right to conduct a fishing expedition through Bio-Rad's records for whatever Brandeis speculates could be a "potential Licensed Product[]."  (Doc. No. 46 ¶ 86.)

### C.    The Amended Complaint Fails to State a Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III)

Brandeis alleges that Bio-Rad breached the implied covenant of good faith and fair dealing based on Bio-Rad's grant of an option to sublicense the Brandeis patents to 10x, Bio-Rad's response to Brandeis's audit requests, and Bio-Rad's lack of Licensed Products.  (Doc. No. 46 ¶ 99.)  None of those allegations states a plausible claim for breach of the implied covenant.

"The covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."  *Zotbelle, Inc. v. Kryolan Corp.*, 416 F. Supp. 3d 33, 48 (D. Mass. 2019) (internal

quotation marks and citation omitted). "Typically, a breach of the implied covenant involves bad faith conduct implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of the fraud." *NextSun Energy Littleton, LLC v. Acadia Ins. Co.*, 494 F. Supp. 3d 1, 21 (D. Mass. 2020) (internal quotation marks and citation omitted). The Amended Complaint pleads no facts that could make Brandeis's claim plausible.

First, with respect to the 10x Cross-License: there was no sublicensing and therefore no obligation for Bio-Rad to provide any reports, records, or opportunity for Brandeis's "consent and participation," (Doc. No 46 ¶ 99). By Brandeis's own admission, Bio-Rad granted 10x only an "option" to execute a separate sublicense agreement for the Brandeis patents at a later date. (*Id.*) Bio-Rad had full license under the Agreement to grant that option, and had no obligation to notify Brandeis because the 10x litigation and Cross-License Agreement did not involve an enforcement action asserting the Brandeis patents or any agreement sublicensing the patents. *Zotbelle*, 416 F. Supp. 3d at 48 ("Actions permitted by a contract that are consistent with the parties' reasonable understanding of performance obligations based on the plain terms of the contract cannot form the basis of a claim for breach of the implied covenant of good faith and fair dealing.").

Second, with respect to Brandeis's audit requests: as described above, Brandeis's audit requests are a fishing expedition untethered from its rights under the Agreement. (*Supra* § VI.A.5.) The implied covenant does not create rights where none exist. *Zotbelle*, 416 F. Supp. 3d at 48 ("[T]he implied covenant cannot 'create rights and duties not otherwise provided for in the existing contractual relationship.'") (internal quotation marks and citation omitted).

Third, with respect to Brandeis's allegation that Bio-Rad has "refuse[d] to designate Licensed Products while commercializing droplet products, systems, and platforms in the field": that Bio-Rad has not yet commercialized a Licensed Product does not mean it has "refus[ed] to

designate Licensed Products" or acted in bad faith with respect to the Agreement.  Bio-Rad explained to Brandeis before it filed its Complaint that the Droplet Generators do not practice the Brandeis patents (and in fact, that one of the products Brandeis identifies was no longer marketed, and has not been for over a decade).  Brandeis has not plausibly alleged that any Bio-Rad product should be designated as a Licensed Product and that Bio-Rad has refused to do so.

Finally, Brandeis fails to plead facts to support its conclusory assertion that "[o]n information and belief, Bio-Rad has purposely withheld details about its commercialization efforts (especially as to products that 'may be determined to be Licensed Products') in a bad-faith effort to deceive Brandeis and avoid paying royalties."  (Doc. No. 46 ¶ 33.)  As noted above, the allegation that Bio-Rad has ever suggested that any of its already-commercialized products "may be" Licensed Products is woefully off-base.  Based on Brandeis's own allegations, Bio-Rad has repeatedly confirmed to Brandeis that while Bio-Rad continues to explore *new* products that "may" use the licensed Brandeis technology none of its existing products are Licensed Products.  Brandeis has alleged no facts alleging the contrary.  As discussed above, (*supra* §IV.A.1), Brandeis fails to allege any facts that could state a plausible claim that any Bio-Rad product is a Licensed Product. Absent that premise, Brandeis cannot plausibly plead that Bio-Rad has any royalty obligations that it could allegedly "avoid" through any "bad-faith effort[s]."  Brandeis's bare allegation is unsupported by any factual allegations and cannot state a claim of bad faith.

Accordingly, Brandeis's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law and should be dismissed.

### D.    Brandeis's Claim for Violation of M.G.L. Ch. 93A § 2 Fails as a Matter of Law (Count IV)

Count IV of Brandeis's Amended Complaint alleges that Bio-Rad's purported breaches of the Agreement constitute unfair or deceptive acts or practices in violation of Massachusetts

General Law Chapter 93A § 2.  Even accepting all pleaded facts as true, Brandeis's claim is legally deficient and should be dismissed.

A claim in a business capacity under 93A applies only to "unfair or deceptive act[s] or practice[s]" occurring "primarily and substantially" within Massachusetts.  Mass. Gen. L. Ch. 93A § 11.  "In making this determination, only *the defendant's* unfair and deceptive acts are relevant; other contacts with Massachusetts 'do not play a part in this assessment.'"  *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 182 (D. Mass. 2023) (quoting *Armstrong v. White Winston Select Asset Funds, LLC*, No. 16-10666-JGD, 2022 WL 17981392, at *24 (D. Mass. Dec. 27, 2022)) (emphasis added).

As an initial matter, none of the conduct Brandeis accuses in the Amended Complaint occurred "primarily and substantially" in Massachusetts, and Brandeis's attempts to draw a nexus to Massachusetts fails.

Brandeis notes that the Agreement selects Massachusetts law as the governing law (Doc. No. 46 ¶ 106), but Brandeis has not alleged any unfair or deceptive conduct relating to the negotiation of the Agreement, and the selection of Massachusetts law in the Agreement is not otherwise relevant.  *See CrunchTime! Info. Sys., Inc. v. Frischs Restaurants, Inc.*, 768 F. Supp. 3d 183, 186 (D. Mass. 2025) (dismissing Chapter 93A claim where, besides plaintiff's allegations that defendant was Massachusetts-based and the parties' agreement was governed by Massachusetts law, "[n]othing in the complaint further elaborates on specific facts having occurred in, or being related to, Massachusetts.").

Second, Brandeis points to its licensing program and audit administration location in Massachusetts and its audit notice, which "issued from Massachusetts."  (Doc. No. 46 ¶¶ 107–08.) But Brandeis's own allegations undermine any nexus to Massachusetts relating to *Bio-Rad's*

alleged acts with respect to the audit notice. Brandeis's letter requested an audit of Bio-Rad's records in California (where Bio-Rad is headquartered) and specifically directed that all materials be delivered to the auditor at a California location. (*See* Doc. No. 46-4, Attachment A at 4.)

Finally, Brandeis asserts that Bio-Rad delivered progress reports and payment of Agreement-related fees into Massachusetts and that Brandeis felt injury to its royalty stream and audit rights there. (Doc. No. 46 ¶¶ 109–10.) As to the former, Bio-Rad is headquartered in California, and Brandeis pleads no facts suggesting that Bio-Rad's commercialization efforts that were the subject of the reports occurred primarily and substantially in Massachusetts. As to the latter, Brandeis's location in Massachusetts alone is insufficient to satisfy the statute's requirement. *See Monahan Prods. LLC v. Sam's E., Inc.*, 463 F. Supp. 3d 128, 152 (D. Mass. 2020) ("a place of injury within Massachusetts [alone] is not a sufficient basis for finding that conduct occurred 'primarily and substantially' within the Commonwealth.").

Accordingly, Count IV of the Amended Complaint should be dismissed.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Bio-Rad respectfully requests the Court grant its Motion to Dismiss Plaintiff's First Amended Complaint.

Dated: November 21, 2025

Respectfully submitted,

/s/ *Elaine Herrmann Blais*

Daniel E. Rosenfeld (BBO #560226)
*drosenfeld@sullivanlaw.com*
Ryan M. Rosenblatt (BBO #698490)
*rrosenblatt@sullivanlaw.com*
Erika J. Dennery (BBO #713005)
*edennery@sullivanlaw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(T) (617) 338-2800

Elaine Herrmann Blais (BBO #656142)
Alexandra Lu (BBO #691114)
Emma Murray (BBO #713447)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1209
Fax: (617) 649-1466
eblais@goodwinlaw.com
alu@goodwinlaw.com

(F) (617) 338-2880                              emurray@goodwinlaw.com

                                                Christine Potkay (*pro hac vice*)
                                                GOODWIN PROCTER LLP
                                                The New York Times Building
                                                620 Eighth Avenue
                                                New York, New York 10018
                                                Telephone.: (212) 813-8800
                                                Facsimile: (212) 355-3333
                                                Cpotkay@goodwinlaw.com

                                                *Counsel for Defendant Bio-Rad Laboratories,
                                                Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above document was filed on November 21, 2025 the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

By: <u>*/s/ Elaine Herrmann Blais*</u>
Elaine Herrmann Blais

22