## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BRANDEIS UNIVERSITY,

      Plaintiff,

             v.

BIO-RAD LABORATORIES, INC.,

      Defendant.

Civil Action No. 1:25-cv-12780

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................. 1

**LEGAL STANDARD** ........................................................................................... 2

**ARGUMENT** ....................................................................................................... 3

    **I.    BRANDEIS HAS SUFFICIENTLY PLED MULTIPLE BREACHES OF THE LICENSE AGREEMENT.** ............................................................................ 3

        **A.    Brandeis has sufficiently pled that Bio-Rad breached Section 4.4 of the License Agreement by refusing to provide access to the requested materials.** ....... 4

        **B.    Brandeis has sufficiently pled that Bio-Rad breached Sections 4.1 and 4.5 by failing to pay royalties on licensed products, or, in the alternative, that it has not used commercially reasonable efforts to commercialize the Licensed IP as required by Section 3.1.** .......................................................................... 6

        **C.    Brandeis has sufficiently pled that Bio-Rad breached Section 2.2 by failing to report the 10X Genomics Cross License to Brandeis, or to ensure that any benefits from the Cross License inured to Brandeis.** ................................................ 8

        **D.    Brandeis has sufficiently pled that Bio-Rad breached Sections 6.1, 6.3, and 6.4 by failing to report its dispute with 10X Genomics or to receive Brandeis' written consent before executing the 10X Genomics Cross License.** ..................... 10

    **II.    BRANDEIS HAS SUFFICIENTLY PLED A DISPUTE APPROPRIATE FOR DECLARATORY JUDGMENT** ................................................................... 11

    **III.    BRANDEIS HAS SUFFICIENTLY PLED A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.** .......................................... 13

    **IV.    BRANDEIS HAS SUFFICIENTLY PLED A VIOLATION OF M.G.L. CH. 93A § 2** ............................................................................................... 14

**CONCLUSION** ..................................................................................................... 16

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                   **Page(s)**

*Anthony's Pier Four, Inc.* v. *HBC Associates*,
   583 N.E.2d 806 (Mass. 1991) ...................................................................................13,15

*Aviceda Therapeutics, Inc.* v. *Trial Runners, LLC*,
   2024 WL 4349205 (D. Mass. Sep. 30, 2024) .......................................................13

*Bell Atlantic Corp.* v. *Twombly*,
   550 U.S. 544 (2007)................................................................................................2

*Butler* v. *Balolia*,
   736 F.3d 609 (1st Cir. 2013)..................................................................................2

*Columbia Plaza Associates* v. *Northeastern University*,
   227 N.E.3d 999 (Mass. 2024) ................................................................................3

*Doe* v. *Secretary of Education*,
   95 N.E.3d 241 (Mass. 2018) ................................................................................12

*Garcia-Catalan* v. *U.S.*,
   734 F. 3d 100 (1st Cir. 2013)................................................................................3

*Guest-Tek Interactive Entertainment Inc.* v. *Pullen*,
   731 F. Supp. 2d 80 (D. Mass. 2010) ...................................................................15

*Icahn School of Medicine at Mount Sinai* v. *Neurocrine Biosciences, Inc.*,
   191 F. Supp. 3d 322 (S.D.N.Y. 2016)...................................................................9

*John Moriarity & Associates, Inc.* v. *Zurich American Insurance Co.*,
   207 N.E.3d 542 (Mass. App. Ct. 2023) ...............................................................12

*Kligler* v. *Attorney General*,
   198 N.E.3d 1229 (Mass. 2022) ............................................................................12

*KPM Analytics North America Corporation* v. *Blue Sun Scientific, LLC*,
   729 F. Supp. 3d 84 (D. Mass. 2024) ...............................................................14, 16

*Kuwaiti Danish Computer Co.* v. *Digital Equipment Corp.*,
   781 N.E.2d 787 ....................................................................................................16

*Massachusetts Employers Insurance Exchange* v. *Propac-Mass, Inc.*,
   648 N.E.2d 435 (Mass. 1995) ..............................................................................15

*Primerica Life Insurance Co.* v. *Bailey*,
   2021 WL 927462 (D. Mass. Mar. 11, 2021)..................................................6, 7, 8

*Sahli* v. *Bull HN Information Systems, Inc.*,
  774 N.E.2d 1085 (Mass. 2002) ..................................................................12

*Sourcing Unlimited, Inc.* v. *Elektroteks, LLC*,
  2021 WL 2875713 (D. Mass. July 8, 2021) ...................................................3

*Targus Group International, Inc.* v. *Sherman*,
  922 N.E.2d 841 (Mass. App. 2010) .............................................................13

*Warren* v. *Children's Hospital Corp.*,
  652 F. Supp. 3d 135 (D. Mass. 2023) ............................................................3

*Workgroup Technology Corp.* v. *MGM Grand Hotel, LLC*,
  246 F. Supp. 2d 102 (D. Mass. 2003) ..........................................................15

**Statutes and Rules**

M.G.L. ch. 93A §§ 2, 11 ..............................................................................14

M.G.L. ch. 231A § 1 ...................................................................................12

Fed. R. Civ. P. 8(d)(2) ..................................................................................6

Plaintiff Brandeis University ("Brandeis"), by and through its counsel, respectfully submits this Memorandum in opposition to Defendant Bio-Rad Laboratories, Inc.'s ("Bio-Rad") Motion to Dismiss Brandeis' First Amended Complaint (Doc. No. 47).

## PRELIMINARY STATEMENT

Bio-Rad is a party to a License Agreement[1] (Doc. No. 46-1) that allows it exclusive use of Licensed IP in return for reasonable efforts to develop and commercialize Licensed Products and royalties on such products. The License Agreement further requires that Bio-Rad produce periodic reports detailing (among others) its commercialization efforts, including supporting documentation, and any royalties owed to Brandeis. To confirm whether Bio-Rad is complying with its obligations, the License Agreement also gives Brandeis the unconditioned, unqualified right to review *any* Bio-Rad materials necessary to verify the accuracy of *any* report required by the License Agreement. Finally, the License Agreement requires that Bio-Rad promptly report any sublicensing activity and ensure that Brandeis receives and can verify a share of any consideration received through such activity.

Over the last few years, Brandeis has become aware of certain Bio-Rad products and legal maneuverings that have raised suspicion as to the veracity of the reports submitted by Bio-Rad. Specifically, Bio-Rad has been making and selling products that very likely practice the Licensed IP, and has granted an "option" to 10X Genomics to practice the Licensed IP as part of a legal settlement; however, Bio-Rad's reports repeatedly claim that Bio-Rad has never produced any Licensed Products or engaged in any sublicensing activity. In a good-faith effort to confirm Bio-Rad's compliance with the License Agreement via its contractual audit right, Brandeis has now

---

[1] Unless otherwise noted, capitalized terms have the same definitions as in Brandeis' First Amended Complaint (Doc. No. 46) (the "Amended Complaint" or "Am. Compl.").

been attempting to conduct a meaningful audit of Bio-Rad's records for over a year. Unfortunately, Bio-Rad has denied access to the records needed for this audit, claiming that Brandeis' audit right is narrowly limited only to a small subset of royalty reports. As made clear by the License Agreement and the Amended Complaint, that reading is wrong: Section 4.4 authorizes an audit "to verify any report required under [the] Agreement," which includes Section 3.2 progress reports (with "supporting documentation") and Section 4.5 annual "full and accurate reporting and accounting" reports, whether or not a payment is due.

Bio-Rad's Memorandum of Law (Doc. No. 48) (the "MoL") leans on three themes: that Brandeis inadequately alleges any Licensed Products; that an "option" granted to 10X Genomics cannot implicate Section 2.2; and that reporting obligations found in Sections 6.3 and 6.4 were never triggered. Each fails at the pleadings stage when the License Agreement's text is read as a whole and in Brandeis' favor, and when the allegations—grounded in the License Agreement, the parties' progress and audit correspondence, and the 10X Genomics Cross-License—are credited as true. The Motion to Dismiss should be denied in its entirety.

## <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" *Butler* v. *Balolia*, 736 F.3d 609, 616 (1st Cir. 2013) (quoting *Bell Atlantic Corp*. v. *Twombly*, 550 U.S. 544, 570 (2007)). In considering a motion to dismiss, factual allegations may be supplemented by "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Id.* at 611 (internal quotation omitted). The complaint must be read as a whole, and "circumstantial evidence often suffices to clarify a protean issue." *Garcia-Catalan* v. *United States*, 734 F. 3d 100, 103 (1st Cir. 2013) (internal quotations omitted). Where "a material part of the information needed is likely to be within the defendant's

control," courts will give extra latitude to the plaintiff when determining plausibility. *Id.* at 104. Courts also "allow breach of contract claims to survive motions to dismiss if the contract could plausibly be read in the plaintiff's favor and the complaint's allegations suggest a breach." *Sourcing Unlimited, Inc.* v. *Elektroteks, LLC*, 2021 WL 2875713, at *13 (D. Mass. July 8, 2021) (citing *Young* v. *Wells Fargo Bank, N.A.*, 717 F.3d 224, 235 (1st Cir. 2013)).

## ARGUMENT

Brandeis' Amended Complaint describes in accurate detail several important provisions of the License Agreement that established the rights and responsibilities of Brandeis and Bio-Rad, and describes how Bio-Rad breached those provisions. Because several breaches involve Bio-Rad's refusal to provide information to Brandeis, the full extent of Bio-Rad's breaches cannot be fully determined at the pleadings stage. But the facts pled—such as specific audit requests, Bio-Rad's progress reports, the 10X Genomics "option," and Bio-Rad's refusal to verify—support reasonable inferences of ongoing breach and concealment to avoid honoring its obligations under the License Agreement. As described below, if even some of these inferences prove out at trial, Bio-Rad will be liable for much more than simple breach.

## I.    BRANDEIS HAS SUFFICIENTLY PLED MULTIPLE BREACHES OF THE LICENSE AGREEMENT.

It is established Massachusetts law that "[i]f the words of a contract are clear, they are dispositive as to the meaning of the contract." *Columbia Plaza Associates* v. *Northeastern University*, 227 N.E.3d 999, 1013 (Mass. 2024) (internal citation omitted). It is also a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other." *Warren* v. *Children's Hospital Corp.*, 652 F. Supp. 3d 135, 145 (D. Mass. 2023) (quoting *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)). The License Agreement contains several clear provisions imposing unambiguous

duties on Bio-Rad, including Sections 2.2, 3.2, 4.4, and 4.5. The Amended Complaint plausibly alleges breaches of these provisions given Bio-Rad's refusal to cooperate with Brandeis' audit request and Bio-Rad's withholding of required information.

### A.    Brandeis has sufficiently pled that Bio-Rad breached Section 4.4 of the License Agreement by refusing to provide access to the requested materials.

Under the clear meaning of Section 4.4 of the License Agreement and giving effect to all of the provisions therein and throughout the License Agreement as a whole, Brandeis has adequately alleged a breach. Section 4.4 explicitly states that Bio-Rad "agrees to permit Brandeis or its representatives . . . to periodically examine its books, ledgers, and records . . . for the purpose of and to the extent necessary to verify *any* report required under [the] Agreement." License Agreement § 4.4 (emphasis added). "Agreement" is a defined term meaning the License Agreement in its entirety. *Id.* at 1. Further, the simple fact that the audit requirement appears in the same "Records" section as the royalty report requirement does not limit the audit requirement to royalty reports alone. *See id.* § 10.8 ("The Section headings are for the convenience of the parties and in no way alter, modify, amend, limit, or restrict the contractual obligations of the parties."). Therefore, Bio-Rad's argument that it need not provide information to verify "reports that Bio-Rad provides under a separate section of the Agreement" (MoL at 15) fails outright. Brandeis' audit right includes materials necessary to verify *any* report required by the Agreement, including (but not limited to) Section 3.2 progress reports "detailing [Bio-Rad's] progress or lack of progress, along with supporting documentation" and Section 4.5's "full and accurate reporting and accounting . . . as well as supporting documents as required by Sections 2.2. and 3.2 and this Section 4.5 regarding any royalties or other consideration" whether or not a payment is due, "including names and addresses of sublicensees." License Agreement §§ 3.2, 4.5, 4.5.5.

Section 4.4 of the License Agreement also requires that Bio-Rad keep "records . . . in sufficient detail to enable the royalties payable hereunder to be determined" for three years. That does not mean that the records Bio-Rad must retain for three years are the ***only*** records that Brandeis can review at an audit, as Bio-Rad claims. *See* MoL at 15. Section 4.4 only sets a minimum retention obligation and does not retract Brandeis' broader right to examine "books, ledgers, and records" necessary to verify any report required under the Agreement. Otherwise, the inclusion of the terms "books" and "ledgers" in Section 4.4 would be superfluous and without effect. Thus, per Sections 3.2, 4.4, and 4.5, Brandeis may verify (1) progress reports and their "supporting documentation," including those retained more than three years, and (2) annual royalty or consideration reports, even when Bio-Rad states there are "no Licensed Products." *See* MoL at 15.

Here, as alleged in the Amended Complaint, Brandeis' audit notice sought materials tethered to verifying reports required by the License Agreement: technical and commercial information for identified droplet systems referenced in Bio-Rad's field (to verify whether progress and annual reports accurately characterize such products as non-Licensed Products), and the Cross License materials (to verify reporting and consideration relating to sublicensing activity and to confirm proper reporting under Section 4.5). Am. Compl. ¶¶ 25, 58-60. Bio-Rad's refusal to provide access frustrates the verification right and constitutes a breach of Section 4.4 of the Agreement. *Id.* ¶ 70.

Even under Bio-Rad's incorrect construction of Section 4.4, Bio-Rad cannot simply claim that it does not produce any Licensed Products as a way to both avoid producing royalty reports and evade an audit to verify those reports. *See* MoL at 14-15. An explicit purpose of the audit process required by Section 4.4 is to determine whether "amounts due to Brandeis . . . have been

underpaid," so allowing Bio-Rad to escape its audit responsibilities by refusing to provide any royalty report at all would render Section 4.4 ineffectual. Indeed, Bio-Rad's contention that it makes no Licensed Products is itself subject to scrutiny under Section 4.4's recordkeeping and audit provisions. Such a reading is unacceptable, especially on consideration of a motion to dismiss.

### B.    Brandeis has sufficiently pled that Bio-Rad breached Sections 4.1 and 4.5 by failing to pay royalties on licensed products, or, in the alternative, that it has not used commercially reasonable efforts to commercialize the Licensed IP as required by Section 3.1.

The Federal Rules permit alternative pleading. Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). Alternative pleading is especially appropriate here because the operative facts needed to determine whether Bio-Rad's products are Licensed Products, and whether royalties and reporting duties were triggered, are within Bio-Rad's control and were the subject of Brandeis's audit request. As such, (a) the full scope and method of Bio-Rad's breach cannot be determined without access to the books, ledgers, and records sought by Brandeis, and (b) the facts that are known by Brandeis make culpability under at least one of those theories plausible. *See Primerica Life Insurance Co.* v. *Bailey*, 2021 WL 927462, at *3 (D. Mass. Mar. 11, 2021) ("The Twombly plausibility standard . . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' (1) where the facts are peculiarly within the possession and control of the defendant, or (2) where the belief is based on factual information that makes the inference of culpability plausible.") (internal citations and quotations omitted).

Bio-Rad itself reported that it "continues to expend resources to develop and commercialize new products and services, some of which may be determined to be Licensed Products," while simultaneously reporting no sales of Licensed Products for the period. Am.

Compl. ¶ 31; Doc. No. 46-2 (Bio-Rad 2023 Progress Report). That juxtaposition—together with Bio-Rad's refusal to allow verification and the lengths it has taken to avoid the audit—supports the reasonable inference that either (1) Bio-Rad is selling Licensed Products and has failed to pay and report under Sections 4.1 and 4.5, or (2) it has not used commercially reasonable efforts consistent with Section 3.1. At a minimum, it should not be difficult to verify the alleged "resources" that Bio-Rad continues to expend to commercialize the Licensed Products.

Bio-Rad devotes significant effort claiming that Brandeis has failed to adequately allege infringement of the Licensed IP. MoL at 7-9. In doing so, Bio-Rad misconstrues the nature of this action entirely because this is not a patent infringement case. Nor can it be, since Bio-Rad is a licensee. This is a breach of contract case, and what Brandeis alleged is that Bio-Rad is failing to produce records necessary to confirm whether Bio-Rad is or is not producing Licensed Products. Am. Compl. ¶¶ 58-62. Proving infringement is therefore not required or appropriate, especially at this stage, because information necessary to verify whether any products practice the Licensed IP is "peculiarly within" Bio-Rad's possession and control. *Primerica*, 2021 WL 927462, at *3.

Bio-Rad similarly claims that Brandeis has failed to adequately plead that Bio-Rad failed to use reasonable efforts to commercialize the Licensed IP. MoL at 13-14. Again, Bio-Rad misconstrues the nature of this action. As established in the Amended Complaint, the information necessary to verify whether Bio-Rad is in fact using reasonable efforts is within Bio-Rad's control, and was requested by Brandeis as part of its contractual audit rights. Am. Compl ¶ 58. Because Bio-Rad has withheld this information (*Id.* ¶ 62), Brandeis has no direct knowledge of whether Bio-Rad is using reasonable efforts or not; however, the fact that Bio-Rad claims it is attempting to commercialize the Licensed IP (*Id.* ¶ 31) but refuses to provide any details regarding those efforts (as required by the License Agreement, *Id.* ¶¶ 23, 32) and claims that it is not producing

Licensed Products (*Id.* ¶ 31) "makes the inference of culpability plausible." *Primerica*, 2021 WL 927462, at *3. The fact that this License Agreement has been in effect for over **fourteen years** and Bio-Rad continues to allege that there are no Licensed Products is also telling, especially given Bio-Rad's track record in this field. *See, e.g.*, MoL at 1 ("Bio-Rad is a *global leader* in developing and manufacturing innovative products for life sciences research and clinical diagnostics.") (emphasis added).

### C.    Brandeis has sufficiently pled that Bio-Rad breached Section 2.2 by failing to report the 10X Genomics Cross License to Brandeis, or to ensure that any benefits from the Cross License inured to Brandeis.

Section 2.2 of the License Agreement establishes Bio-Rad's sublicensing rights and corresponding duties. Most importantly, Bio-Rad has a duty to make sure that any benefits arising from sublicenses inure in part to Brandeis. Am. Compl. ¶ 29; License Agreement § 2.2.1 ("Sublicenses . . . must preserve the rights of Brandeis, Harvard, and the U.S. Government" and "Brandeis and Harvard shall be third party beneficiaries of such sublicense agreements"). Bio-Rad is also required to report any sublicense agreements to Brandeis (Am. Compl. ¶ 29; License Agreement § 2.2.1) and must seek Brandeis' written consent before executing any sublicense wherein Bio-Rad receives non-monetary consideration (or, failing that, must fix a monetary value to such non-monetary consideration). License Agreement § 2.2.2.

The 10x Cross License expressly references the "Brandeis Agreement" and "Brandeis Patents," and grants 10X Genomics "an option … to obtain (subject to the applicable terms of the Brandeis Agreement . . . including the Parties obtaining all necessary consents pertaining thereto) a non-exclusive, worldwide, royalty-bearing sublicense . . . under the Brandeis Patents." Am. Compl. ¶ 39; Doc. No. 46-3 (Cross License) § 3.1.4. Bio-Rad publicly reported receiving $31.6 million of royalty revenue "related to an intellectual property litigation settlement" during the

period of that Cross License (Am. Compl. ¶ 46), further underscoring that significant consideration flowed in connection with the settlement package in which the Brandeis "option" right was bargained-for.

As with its Section 4.4 breaches, Bio-Rad seeks to improperly narrow this requirement. It claims that granting rights to the Licensed IP in the form of an "option" meant it was not a "fully executed sublicense agreement" triggering a reporting duty. *See* MoL at 11-12. Although not totally defined in the License Agreement, it is generally accepted that a sublicense is "a contract granting to a third party a portion or all of the rights granted to the licensee under an original license." *Icahn School of Medicine at Mount Sinai* v. *Neurocrine Biosciences, Inc.*, 191 F. Supp. 3d 322, 330 (S.D.N.Y. 2016) (quoting *Sublicense*, BLACK'S LAW DICTIONARY (10th ed. 2014)). Although the 10X Genomics "option" may not have activated all of the specific provisions required by the License Agreement, it cannot be reasonably disputed that, by executing the Cross License, Bio-Rad granted at least a "portion" of its rights under the License Agreement to 10X Genomics. And by conveying a portion of Bio-Rad's licensed rights consistent with a sublicense by granting the "option," Section 2.2's reporting and verification obligations were triggered.

Of equal importance is that the "option" was a bargained-for benefit used as consideration to settle a valuable legal claim, and was very likely material consideration in exchange for which Bio-Rad received millions of dollars. Am. Compl. ¶¶ 44, 46. As described above and in the Amended Complaint, Bio-Rad neither obtained Brandeis' written permission to grant the "option" in exchange for settlement of their dispute with 10X Genomics, nor assigned any value attributable to the "option," a clear breach of Section 2.2.2 of the License Agreement. *Id.* ¶¶ 47. If Bio-Rad did receive monetary consideration in exchange for the "option," none of that benefit inured to Brandeis as required by Section 2.2.1 of the License Agreement.

Even if the unexercised "option" is not, standing alone, a "fully executed sublicense agreement" (MoL at 12), Section 2.2.2 still requires Bio-Rad to record and report the fair market value of any non-monetary consideration received as consideration for sublicensed rights to the Licensed IP. Section 2.2.1 also requires reporting and verification of related consideration under the sublicensing umbrella. Bio-Rad did neither; it did not seek Brandeis' consent, assign a value, or provide reports permitting Brandeis to verify the consideration attributable to the Brandeis-related rights embedded in the settlement. That is a current, plausible breach, regardless of whether 10X Genomics later exercises the "option."

>   **D.    Brandeis has sufficiently pled that Bio-Rad breached Sections 6.1, 6.3, and 6.4 by failing to report its dispute with 10X Genomics or to receive Brandeis' written consent before executing the 10X Genomics Cross License.**

Section 6 of the License Agreement establishes the rights and responsibilities of Brandeis and Bio-Rad with respect to third-party infringement of the Licensed IP. Section 6.1 specifically requires that either party report "actual, potential, or threatened infringement," unfair competition, "or other harmful or wrongful activities of third parties" with respect to the Licensed IP. Section 6.3 further requires that Bio-Rad notify Brandeis if it intends to file suit against any infringers, and that it shall "keep Brandeis reasonably informed of the progress of infringement actions and shall consult in advance with Brandeis regarding any major decision affecting such action." Section 6.4 ultimately requires that neither party enter into any "settlement, consent, judgment, or other voluntary final disposition of an infringement suit" without the consent of the other party. Reading these provisions together in a manner giving meaning to each means that Bio-Rad has a duty to report any conflicts created by suspected infringers, any intent to enforce the Licensed IP (whether or not litigation ultimately results), and a duty to keep Brandeis reasonably informed of its intentions with respect to those suspected infringers.

The Amended Complaint clearly alleges facts showing that the Licensed IP involves microfluidics, that 10X Genomics is a competitor in the field of microfluidics, and that there has been ongoing litigation between Bio-Rad and 10X Genomics in recent years. Am. Compl. ¶¶ 13, 37-38. The Amended Complaint also describes how 10X Genomics markets products that likely practice the Licensed IP. *Id.* ¶¶ 53-54. Finally, as discussed above, the Cross License settling the Bio-Rad/10X Genomics disputes included the "option" to practice the Licensed IP, for which Bio-Rad also very likely received monetary compensation. Am. Compl. ¶¶ 39, 44, 46. These facts are strong evidence that the Licensed IP was at the very least a significant item of discussion during the Bio-Rad/10X Genomics settlement discussions, and make it more than plausible that "Bio-Rad intended to assert and use the Licensed IP as negotiating leverage in the 10X Genomics litigation, which triggered Section 6.3's notice duty." Am. Compl. ¶43.

As with Bio-Rad's other suspicious behavior, details about the role of the Licensed IP in the 10X Genomics Cross License and Bio-Rad's ultimate intent to enforce or not enforce the Licensed IP against 10X Genomics remains a mystery to Brandeis. That is precisely why, among other reasons, Brandeis requested an unredacted copy of the Cross License along with other details of the Bio-Rad/10X Genomics litigation in its audit request. *See id.* ¶¶ 59-60. Bio-Rad's refusal to provide that information (which as described above is also a breach of Section 4.4 of the License Agreement) casts more suspicion on Bio-Rad's actions and motives regarding the Licensed IP, ultimately making Brandeis' claims much more than the "conclusory allegation" Bio-Rad argues them to be. MoL at 10-11.

## II. BRANDEIS HAS SUFFICIENTLY PLED A DISPUTE APPROPRIATE FOR DECLARATORY JUDGMENT

Massachusetts courts may "make binding declarations of right, duty, status and other legal relations . . . in any case in which an actual controversy has arisen and is specifically set forth . . .

and whether any consequential judgment or relief is or could be claimed at law or in equity or not." M.G.L. ch. 231A, § 1. Where (as plainly evident here) contrary interpretations of a contract create a dispute as to the rights granted by the contract, a declaratory judgment proceeding is particularly appropriate. *Sahli* v. *Bull HN Information Systems, Inc.*, 774 N.E.2d 1085, 1092 (Mass. 2002) ("The determination of contractual rights is a proper subject of a declaratory judgment proceeding."). To sufficiently plead a declaratory judgment claim, a plaintiff need only show that an "actual controversy" exists and that they have standing, and "both requirements are liberally construed." *Kligler* v. *Attorney General*, 198 N.E.3d 1229, 1240 (Mass. 2022); *Doe* v. *Secretary of Education*, 95 N.E.3d 241, 251 (Mass. 2018) (internal citation omitted).

Brandeis has adequately pled both an actual controversy and standing. An actual controversy exists when there is "a real dispute caused by the assertion by one party of a legal relation, status or right in which he has a definite interest, and the ***denial of such assertion by another party*** also having a definite interest in the subject matter, where the circumstances attending the dispute plainly indicate that ***unless the matter is adjusted such antagonistic claims will almost immediately and inevitably lead to litigation***." *John Moriarity & Associates, Inc.* v. *Zurich American Insurance Co.*, 207 N.E.3d 542, 552 (Mass. App. Ct. 2023) (internal quotations omitted) (emphases added). It is undisputed that the License Agreement contains an audit clause, and, as signatories, both Brandeis and Bio-Rad have interests in the rights created by (and the subject matter of) the License Agreement. Am. Compl. ¶¶ 15, 17, 83-84, 88. Further, the Amended Complaint makes clear that Bio-Rad's contrary interpretation of the License Agreement and subsequent refusal to submit to Brandeis' audit request is a denial of the unconditional audit right granted to Brandeis by the License Agreement. *Id.* ¶¶ 23-26, 61. Under these circumstances, continued disputes are likely due to the parties' fundamental disagreements over the scope of

Section 4.4 and other provisions of the License Agreement, which have already been ongoing for more than a year. *Id.* ¶¶ 57-65; MoL at 11-16.

### III.    BRANDEIS HAS SUFFICIENTLY PLED A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

The implied covenant of good faith and fair dealing is a part of any contract in Massachusetts, and it requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Aviceda Therapeutics, Inc.* v. *Trial Runners, LLC*, 2024 WL 4349205, at *6 (D. Mass. Sep. 30, 2024) (quoting *Anthony's Pier Four, Inc.* v. *HBC Associates*, 583 N.E.2d 806, 820 (Mass. 1991)). A breach of the implied covenant generally involves conduct "implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of fraud." *Targus Group International, Inc.* v. *Sherman*, 922 N.E.2d 841, 853 (Mass. App. 2010) (internal quotation omitted). However, to support a finding of breach, plaintiffs "need not prove the defendant explicitly acted in bad faith, but rather with a lack of good faith inferred from the circumstances." *Aviceda*, 2024 WL 4349205, at *6.

It is more than reasonable to infer a lack of good faith in service of a dishonest purpose from the facts alleged in the Amended Complaint: namely, avoiding payment of royalties due to Brandeis by either withholding evidence that it is producing Licensed Products or by not making reasonable attempts to commercialize the Licensed IP. First, Bio-Rad has and is currently producing products that Brandeis reasonably believes are Licensed Products (Bio-Rad has even admitted that it is "expend[ing] resources to develop and commercialize new products and services, some of which may be determined to be Licensed Products") but has not paid any royalties to Brandeis or provided any details regarding its claimed commercialization efforts. Am. Compl. ¶¶ 30-32. Second, it has repeatedly refused to cooperate in any way with Brandeis' audit

13

request, or to cure numerous other breaches of the express provisions of the Agreement. *Id.* ¶¶ 45-47, 63-64. Third, it has used the Licensed IP as negotiating leverage with 10X Genomics in order to settle a valuable legal claim (and likely to increase its own monetary compensation) without notifying Brandeis. *Id.* ¶¶ 45-48. This behavior supports Brandeis' plausible allegations that Bio-Rad has been purposely concealing either its failure to expend reasonable efforts to commercialize the licensed IP (*Id.* ¶¶ 33, 35) or its production of Licensed Products (*Id.* ¶ 65). Under these circumstances, it can easily be inferred that these actions were ultimately designed and intended to avoid paying royalties (the "fruits of the contract") to Brandeis. *Id.* ¶ 99.

## IV.    BRANDEIS HAS SUFFICIENTLY PLED A VIOLATION OF M.G.L. CH. 93A § 2

M.G.L. ch. 93A § 2 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Civil claims may be brought when those acts "occur[] primarily and substantially within the commonwealth." *Id.* § 11. A practice is unfair if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *KPM Analytics North America Corp.* v. *Blue Sun Scientific, LLC*, 729 F. Supp. 3d 84, 114 (D. Mass. 2024) (internal quotation omitted). A practice is deceptive "if it possesses a tendency to deceive." *Id.* (internal quotation omitted).

On the facts as alleged in the Amended Complaint, Bio-Rad is liable for violation of ch. 93A for much of the same reasons that subject it to liability for breach of the implied covenant, as behavior "within the penumbra" of the implied covenant is also sufficient to show violation of ch. 93A. *Id; see also Massachusetts Employers Insurance Exchange* v. *Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995) ("a breach of the implied covenant of good faith and fair dealing

may constitute an unfair or deceptive act or practice for the purposes of G.L. c. 93A") (internal citation omitted).

Even if Bio-Rad's behavior was not "within the penumbra" of the implied covenant, its refusal to cooperate with Brandeis' audit request alone is enough for liability under ch. 93A. *See Anthony's Pier Four*, 583 N.E.2d at 821 ("conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes") (internal quotation and citation omitted). As noted above, the Amended Complaint makes clear that Bio-Rad is disregarding Section 4.4 of the License Agreement (Am. Compl. ¶ 62) with the intention of concealing other breaches of the License Agreement and, ultimately, to avoid paying royalties to Brandeis. *Id.* ¶¶ 65, 104.

The "primarily and substantially within the commonwealth" requirement of ch. 93A claims is inappropriate for a court to analyze on a motion to dismiss when the plaintiff is "located, and claims an injury in Massachusetts." *See Guest-Tek Interactive Entertainment Inc.* v. *Pullen*, 731 F. Supp. 2d 80, 92 (D. Mass. 2010) (denying motion to dismiss ch. 93A claim when plaintiff was located in Massachusetts and the alleged harm "manifest[ed] itself at their principal place of business in Massachusetts."). Ultimately, whether conduct was "primarily and substantially within the commonwealth" must be made after findings of fact, which do not occur at the motion to dismiss phase. *Workgroup Technology Corp.* v. *MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 118 (D. Mass. 2003) (citing *Kuwaiti Danish Computer Co.* v. *Digital Equipment Corp.*, 781 N.E.2d 787, 799 (Mass. 2003)) (denying motion to dismiss without prejudice to raise the issue on a motion for summary judgment after fact discovery). Because Brandeis is located in Massachusetts (Am. Compl. ¶ 1) and Bio-Rad's misconduct has caused loss of royalty income that has manifested itself in Massachusetts (*Id.* ¶ 110), Brandeis' ch. 93A claim must not be dismissed. However, even

assuming that the sort of fact-intensive analysis required to determine whether the "primarily and substantially" requirement has been met were a proper issue at the motion to dismiss stage, the facts as pleaded show significant connections to Massachusetts.

The Supreme Judicial Court of Massachusetts has cautioned that analysis of the "primarily and substantially" requirement "should not be based on a test identified by any particular factor or factors." *Kuwaiti Danish*, 781 N.E.2d at 799. However, factors such as where the misconduct was committed, where the plaintiff "receives or acts on the wrongful conduct," and where the plaintiff sustains losses, "while not an exhaustive list, can certainly guide [the] Court's inquiry." *KPM Analytics*, 729 F. Supp. 3d at 118. It is indisputable that Brandeis, a Massachusetts university, received and acted on Bio-Rad's wrongful conduct (which by contract was governed by Massachusetts law) in Massachusetts. *See id.* at 118-19 (finding that plaintiff received wrongful conduct in Massachusetts when, *inter alia*, plaintiff was based in Massachusetts and defendant's wrongful conduct was governed by Massachusetts law); Am. Compl. ¶¶ 1, 8; License Agreement § 10.5. It also cannot be disputed that Brandeis has both received Bio-Rad's communications and sustained loss resulting from those communications in Massachusetts. *See* License Agreement §§ 4.6, 10.3 (all payments due under the License Agreement are to be delivered to Brandeis at its Massachusetts address, and all reports are to be delivered to same).

<u>**CONCLUSION**</u>

For the above reasons, Brandeis respectfully requests that Bio-Rad's Motion to Dismiss the Amended Complaint be denied in its entirety.

Dated: December 12, 2025                    Respectfully submitted,

                                            **BRANDEIS UNIVERSITY**
                                            By its attorneys,

/s/ *Halima Ndai*
Alfonso Garcia Chan*
Halima Shukri Ndai**
CAHILL GORDON & REINDEL LLP
900 16th Street, N.W., Suite 500
Washington, DC 20006
Telephone: (202) 862-8900
achan@cahill.com
hndai@cahill.com

Aaron Dettman*
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
adettman@cahill.com

Daniel J. Cloherty (BBO #565772)
Melanie Stallone (BBO 711658)
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
Telephone: 617-481-0169
dcloherty@clohertysteinberg.com
mstallone@clohertysteinberg.com

*Leave to appear pro hac vice granted on
October 21, 2025*

**Leave to appear pro hac vice granted on
October 24, 2025*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, this document was filed through the ECF System of the United States District Court for the District of Massachusetts and will be served electronically on the Registered Participants in the Notice of Electronic Filing.

/s/ *Halima Ndai*
Halima Shukri Ndai

17