# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

BRANDEIS UNIVERSITY,

Plaintiff,

    v.

BIO-RAD LABORATORIES, INC.,

Defendant.

Civil Action No. 1:25-cv-12780

**[PROPOSED] SECOND AMENDED COMPLAINT AND JURY TRIAL DEMAND**

This is an action brought by Brandeis University ("Brandeis") against Bio-Rad Laboratories, Inc. ("Bio-Rad") for breach of contract, declaratory judgment, breach of the implied covenant of good faith and fair dealing, and violations of Massachusetts General Law Chapter 93A § 2, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

**THE PARTIES**

1.      Brandeis is a non-profit educational institution organized under the laws of Massachusetts having its primary place of business at 415 South Street, Waltham, Massachusetts, 02454-9110.

2.      Brandeis was founded in 1948 as a non-sectarian institution committed to providing a world-class education. Brandeis has more than 3500 undergraduate and more than 1000 graduate students, and employs more than 1500 faculty and staff.[1][2]

---

[1] https://www.brandeis.edu/factbook/enrollment.html.
[2] https://www.brandeis.edu/about/facts/index.html.

3.      Brandeis is proud to be home to award-winning faculty and alumni, including those who have received Nobel Prizes, MacArthur Fellowships, and Pulitzer Prizes.

4.      As a medium-sized research university with global reach, Brandeis is dedicated to first-rate education while making groundbreaking discoveries.[3] Research conducted by the faculty and students of Brandeis has been cited in numerous professional publications across multiple scientific and engineering disciplines.

5.      On information and belief, Bio-Rad is a corporation organized under the laws of Delaware having its primary place of business at 1000 Alfred Nobel Drive, Hercules, California, 94547.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1441.

7.      This action was originally filed in the Suffolk County Superior Court of the Commonwealth of Massachusetts, and removed by Bio-Rad to this Court on September 26, 2025. Dkt. No. 1.

8.      Bio-Rad has consented to personal jurisdiction in this Court pursuant to the "Governing Law" clause of the parties' license agreement executed on December 22, 2011 and amended on March 21, 2019 (the "Agreement").[4] Agreement § 10.5. Brandeis' causes of action arise out of and specifically relate to the Agreement.

---

[3] https://www.brandeis.edu/our-research/index.html.
[4] Attached hereto as Exhibit A is a true and correct copy of the Agreement, which has been filed under seal pursuant to the Court's Order dated October 9, 2025.  *See* ECF No. 17.

9. Venue in this judicial district is proper pursuant to Section 10.5 of the Agreement. *Id.* Bio-Rad agreed that any action arising out of or related to the Agreement will be filed in courts of competent jurisdiction located in Boston, Massachusetts. *Id.*; *see also* Dkt. No. 1. ¶ 3.

## BACKGROUND

10. Brandeis is a joint owner of U.S. Patent No. 8,592,221 (the "'221 Patent"). Pursuant to a Joint Invention Administration Agreement with non-party assignee President and Fellows of Harvard College, Brandeis has sole responsibility for administration of all rights in the '221 Patent, including filing, prosecution, maintenance, defense, enforcement, and licensing.

11. Brandeis is the sole owner of U.S. Patent No. 8,772,046 (the "'046 Patent").

12. The '221 Patent, '046 Patent, and patents related thereto are hereinafter referred to as the "Licensed IP."

13. The Licensed IP describe structures and methods for (among others) producing and manipulating miniscule fluid droplets of precise size. This technology is valuable in important disciplines such as genetic analysis, chemical diagnostics, drug screening, and environmental monitoring.

14. The Licensed IP was invented by the faculty and students of Harvard University and Brandeis within the Commonwealth of Massachusetts.

15. On December 22, 2011, Brandeis and RainDance Technologies, Inc. ("RainDance") entered into the Agreement, which granted RainDance an exclusive license to the Licensed IP. Agreement § 2.1.

16. On or around February 15, 2017, Bio-Rad acquired RainDance. *See* Amendment No. 1 to the Agreement.

17.     On March 21, 2019, Brandeis and Bio-Rad amended the Agreement to change, among others, all instances of RainDance to Bio-Rad. *Id*. Thus, the parties to the Agreement are now Brandeis and Bio-Rad.

**A.  Bio-Rad's Responsibilities Under the Agreement**

18.     Bio-Rad is required to pay Brandeis an annual royalty on the "Net Sales" of all Licensed Products. Agreement § 4.1, Agreement Exhibit A, Agreement Amendment 1.

19.     "Net Sales" means the Gross Sales (i.e., amount invoiced or payable for the sale of Licensed Products in arm's length sales or transaction) received by Bio-Rad or any sublicensee less certain specified expenditures. Agreement §§ 1.4 & 1.7.

20.     "Licensed Products" include any composition or method that would infringe the Licensed IP but for the existence of the Agreement. *Id*. § 1.6.

21.     Bio-Rad is required to use "commercially reasonable best efforts" to develop and make available Licensed Products for commercial sales and distribution. *Id*. § 3.1.

22.     Bio-Rad is required to use "reasonable discretion" in determining "commercially reasonable best efforts." *Id*.

23.     Bio-Rad must also submit annual progress reports (the "Annual Reports") detailing its progress (or lack thereof) towards commercialization and provide supporting documentation. *Id*. §§ 3.1, 3.2, Amendment 1.

24.     To enable determination of royalties payable under the Agreement, Bio-Rad is required to keep complete and accurate records in sufficient detail and retain those records for three years following the end of the year to which those records relate. *Id*. § 4.4.

25.     With 14 days' written notice, Bio-Rad must also permit Brandeis to periodically examine its books, ledgers, and records "for the purpose of and to the extent necessary" to verify any report required by the Agreement. *Id*.

26.    Per the Agreement, Brandeis' audit right is not conditioned on any statements or actions by Bio-Rad.

27.    In the event that an audit reveals underpayment of royalties owed, Bio-Rad agreed to pay the cost of the audit and all overdue amounts with accrued interest. *Id*. §§ 4.2, 4.4.

28.    Bio-Rad is also required to provide Brandeis with an annual full and accurate reporting and accounting of (among others) the use or sales of Licensed Products by Bio-Rad or any sublicensees, "[w]hether or not a payment is due." *Id*. § 4.5.

29.    Pursuant to Section 2.2 of the Agreement, Bio-Rad has the right to sublicense the Licensed IP, so long as any sublicense imposes the same royalties and responsibilities benefitting Brandeis and Bio-Rad promptly reports any such sublicense to Brandeis, including any royalty or non-royalty consideration under such sublicense agreements. *Id*. § 2.2.

30.    To date, Bio-Rad has not reported any sales of Licensed Products, any sublicensing agreements, or any royalty or non-royalty payments received. Bio-Rad has also not paid any royalties to Brandeis or submitted any report regarding royalties or consideration as required by Section 4.5 of the Agreement.

31.    In its progress reports pursuant to Section 3.2 of the Agreement, Bio-Rad claims that it did not sell Licensed Products in any accounting period to date, but has expended resources to develop and commercialize such products.[5] For example, the 2023 progress report confirms that some of the products Bio-Rad developed and commercialized "may be determined to be Licensed Products," and that Bio-Rad continues its licensing efforts with third parties. Exhibit B.

---

[5] Attached hereto as Exhibit B is a true and correct copy of Bio-Rad's 2023 Progress Report, which has been filed under seal pursuant to the Court's Order dated October 9, 2025.  *See* ECF No. 17.

32.    Despite repeated requests, Bio-Rad has never provided any details or supporting documentation regarding the purported development and commercialization of Licensed Products or licensing efforts with any third parties.

33.    On information and belief, Bio-Rad has purposely withheld details about its commercialization efforts (especially as to products that "may be determined to be Licensed Products") in a bad-faith effort to deceive Brandeis and avoid paying royalties.

34.    Publicly available materials reflect Bio-Rad's sustained investment in droplet microfluidic platforms and consumables directed to the same field and uses as the Licensed IP,[6] while Bio-Rad has refused to designate any Licensed Products or pay royalties.

35.    On information and belief, Bio-Rad elected product configurations and commercialization priorities to avoid claim-triggering implementations despite technical feasibility and market demand for implementations that would practice the Licensed IP, thereby unreasonably exercising its reasonable discretion under Section 3.1 and frustrating the Agreement's royalty bargain.

### B.  The 10X Genomics Litigation and the Cross License

36.    Per Sections 6.1 and 6.3 of the Agreement, Bio-Rad is required to inform Brandeis of any "harmful or wrongful activities of third parties" with respect to the licensed IP, and any intent to enforce the Licensed IP against infringers. Per Section 6.4 of the Agreement, Bio-Rad must obtain Brandeis' consent before settling any such dispute.

37.    Bio-Rad has been involved in extensive litigation with competitors in the field of microfluidics in recent years. *See, e.g., Bio-Rad Laboratories, Inc.* v. *10X Genomics*, Civil Action No. 19-CV-12533-WGY, 2020 WL 2079422 (D. Mass. Apr. 30, 2020).

---

[6] *See, e.g.*, https://investors.bio-rad.com/press-releases/news-details/2025/Bio-Rad-Offers-to-Acquire-Digital-PCR-Developer-Stilla-Technologies/default.aspx.

38.     On or around July 26, 2021, Bio-Rad entered into a Settlement and Patent Cross License Agreement (the "Cross License") with non-party 10X Genomics, Inc. ("10X Genomics"), settling multiple disputes. A true and correct redacted copy of the Cross License is attached hereto as Exhibit C.

39.     The Cross License explicitly references the Agreement, and the Licensed IP, and expressly grants 10X Genomics an option to attain a sublicense in said Licensed IP during the "Term" of the Cross License. Cross License §§ 1.11, 1.12 & 3.1.4.

> 1.11.  "**Brandeis Agreement**" means that certain agreement between Brandeis University and Bio-Rad (as successor in interest to RainDance Technologies, Inc.) dated December 22, 2011 related to Brandeis Case 2007-0201.
>
> 1.12.  "**Brandeis Patents**" has the same meaning as the definition of "Patent Rights" in the Brandeis Agreement.

> 3.1.4.  Subject to the terms and conditions of this Agreement, Bio-Rad hereby grants 10x an option, exercisable by 10x during the Term, to obtain (subject to the applicable terms of the Brandeis Agreement as described in this Section 3.1.4 further below,

40.     The Cross License provides that the period "Term" continues "until the expiration of the last surviving patent among the Agreement Patents." Cross License § 8.1.

> 8.1.  Term. This Agreement, including the licenses and covenants granted under Section 3.1, Section 3.2 and Section 3.3 of this Agreement, is effective as of the Effective Date and continues (subject to Section 8.2 and Section 8.4) until the expiration of the last surviving patent among the Agreement Patents (such period, the "**Term**").

41.     The publicly available Cross License does not include a list of the "Agreement Patents." *See, e.g.*, Exhibit C at 39.

> **Exhibit 1.3 – 10x Patents**
>
> [***]

42. Without a complete list the Agreement Patents, it is impossible to determine when the Cross License's "Term" ends as this period depends on the patent expiration dates.

43. On information and belief, Bio-Rad intended to assert and use the Licensed IP in negotiating leverage in the 10X Genomics litigation, which triggered Section 6.3's notice duty.

44. 10X Genomics received the option right to sublicense the Licensed IP as a bargained for benefit.

45. Bio-Rad never consulted with Brandeis nor obtained its consent before entering into the Cross License as required by Section 6.4 of the Agreement.

46. The details of the consideration received by Bio-Rad are redacted; however, Bio-Rad publicly claimed to have received $31.6 million as royalty revenue "related to an intellectual property litigation settlement" [7] in the same period when the Cross License was executed.

47. Even if Bio-Rad had received no monetary compensation for the option, Bio-Rad had a duty to assign a fair market value to *anything* it received in exchange for the Cross License and report such exchange to Brandeis pursuant to Section 2.2.2 of the Agreement.

48. Bio-Rad never disclosed the existence of the Cross License or otherwise included the 10X Genomics "option" in any reports submitted to Brandeis.

49. On information and belief, Bio-Rad chose to offer the Licensed IP as an "option" in exchange for valuable consideration to avoid payment of royalties to Brandeis.

50. Brandeis became aware of the Cross License through its own administrative audit process in 2024.

---

[7] BIO-RAD LABORATORIES, INC. Q3 2021 FORM 10-Q at 35, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000012208/000001220821000050/bio-20210930.htm ("[D]uring the third quarter of 2021, we recorded $31.6 million of royalty revenue related to an intellectual property litigation settlement that pertained to the sales of infringing products that occurred during the period from November 2018 through July 2021.").

51.    Also in 2024, Brandeis became aware that Bio-Rad was marketing several products that produce miniscule fluid droplets of precise size, such as the Automated Droplet Generator, QX100 Droplet Generator, and QX200 Droplet Generator ("Droplet Generators").

52.    Bio-Rad's promotional and instructional materials show close similarities between the methods and structures used in the Droplet Generators and the methods and structures described in the Licensed IP.

53.    Brandeis also became aware that 10X Genomics markets products that use similar technology to perform cell partitioning for medical testing, such as the Chromium Controller.

54.    On information and belief, Bio-Rad's Droplet Generators and 10X Genomics' Chromium Controller, among others, likely practice the Licensed IP and are Licensed Products.

**C.  Bio-Rad's Refusal to Cooperate with Brandeis' Contractually Permitted Audit**

55.    The above events led Brandeis to believe that Bio-Rad was violating the terms of the Agreement, prompting Brandeis to exercise its rights under Section 4.4 of the Agreement to review Bio-Rad's books, ledgers, and records.

56.    On July 30, 2024, Brandeis engaged Mr. Doug Aguilera, an independent auditor, to examine Bio-Rad's books, ledgers, and records. Mr. Aguilera is a licensed Certified Public Accountant (CPA), Certified Forensic Accountant (CFF), and Certified Fraud Examiner (CFE) with over 30 years of global accounting services expertise.[8]

57.    On September 3, 2024, Brandeis sent Bio-Rad an audit notification letter (the "Audit Notification") providing the 14-day written notice required by Section 4.4 of the Agreement and formally requesting access to certain Bio-Rad information and documents. A true and correct copy of Brandeis' notice is attached hereto as Exhibit D.

---

[8] https://www.aguileraassociates.com/about; https://www.linkedin.com/in/dougaguilera/.

58.      The Audit Notification identified several "Audit Products," including the Droplet Generators, requesting that Bio-Rad produce technical data and sales information regarding same. *Id*. This data was within the scope of Brandeis' audit rights, as it was for the purpose of and necessary to verify Bio-Rad's Annual Reports regarding its commercialization efforts. Agreement §§ 3.2, 4.4; Exhibit B.

59.      The Audit Notification also requested information regarding the Cross License, which was for the purpose of and necessary to verify Bio-Rad's Annual Reports regarding its licensing efforts. Agreement §§ 3.2, 4.4; Exhibit B.

60.      Information regarding both the Audit Products and the Cross License was also necessary to verify whether Bio-Rad's withholding of any royalty information per Section 4.5 of the Agreement was proper.

61.      On October 1, 2024, Mr. Aguilera met with Bio-Rad to discuss the proposed conduct of the review. At the meeting, Bio-Rad claimed that it did not utilize or sublicense the Licensed IP, nor manufacture Licensed Products. Bio-Rad also claimed that it was under no obligation to cooperate with Mr. Aguilera's audit because it did not produce Licensed Products.

62.      After months of back and forth, Bio-Rad refused to provide the necessary information and documentation required under the audit provision of the Agreement, including financial information and details related to its settlement with 10X Genomics, and continues to thwart Mr. Aguilera's audit attempts.

63.      Consequently, on November 21, 2024, Brandeis sent Bio-Rad a formal notice pursuant to Section 9.1 of the Agreement, informing Bio-Rad of its various material breaches of

the Agreement, including (among others) Bio-Rad's refusal to provide the requested information and permit the audit.[9]

64.     Despite the formal notice, Bio-Rad has failed to cure the identified breaches.

65.     On information and belief, Bio-Rad is purposely evading its audit responsibilities under the Agreement to conceal evidence that it is producing Licensed Products.

**D. The Quanterix Correspondence**

66.     Section 6.1 of the Agreement requires that "*[i]f either party becomes aware of any actual, potential, or threatened infringement*, misappropriation, act of unfair competition, or other harmful or wrongful activities of third parties with respect to the [Licensed IP], such party shall, *with reasonable promptness*, notify the other party and provide relevant information and documentation" (emphasis added).

67.     Section 6.2 of the Agreement further provides that if Bio-Rad fails to take action to enforce the Licensed IP against a suspected infringer within 90 days of notice, Brandeis has the right to prosecute the infringement at its own expense. Agreement § 6.2.

68.     The Agreement thus gives Bio-Rad first rights to prosecute infringement of the Licensed IP against third parties, but allows Brandeis to prosecute infringement if Bio-Rad fails to do so within 90 days of the notice. Agreement §§ 6.2, 6.3.

69.     On or around August 28, 2018, Bio-Rad sent a letter to non-party Quanterix, Inc. ("Quanterix") that (i) identified Bio-Rad as the exclusive licensee of the '221 Patent, (ii) claimed that several of Quanterix's products utilized technology covered by the '221 Patent, and (iii) invited Quanterix to license the '221 Patent.

---

[9] Attached hereto as Exhibit E is a true and correct copy of Brandeis' breach notice, which has been filed under seal pursuant to the Court's Order dated October 9, 2025. *See* ECF No. 17.

70.     On information and belief, Bio-Rad believed that Quanterix's products infringed the '221 Patent before sending its August 28, 2018 letter.

71.     Bio-Rad did not notify Brandeis that it believed Quanterix's products infringed the '221 Patent when it sent the August 28, 2018 letter.

72.     Thereafter, on or about July 23, 2019, August 13, 2021, and May 24, 2024, Bio-Rad sent three (3) more letters to Quanterix repeating its assertion that Quanterix's products infringed the '221 Patent (and other patents that issued as divisionals or continuations of the '221 Patent). The May 24, 2024 letter even included exemplary claim charts mapping Quanterix's Simoa Bead Technology to specific claims of the Licensed IP. Bio-Rad did not notify Brandeis of any of these subsequent letters when they were sent.

73.     On March 12, 2026, nearly seven months after Brandeis filed this suit, Bio-Rad sent one more letter to Quanterix continuing to allege infringement and referencing its prior letters. Then, for the first time, Bio-Rad sent Brandeis copies of its Quanterix correspondence with a letter dated March 19, 2026, which Brandeis received on March 23, 2026. True and correct copies of Bio-Rad's March 19, 2026 letter to Brandeis and the included Quanterix correspondence are attached hereto as Exhibit F.

74.     At no time prior to March 23, 2026 was Brandeis aware of Bio-Rad's correspondence with Quanterix or its belief that Quanterix's products infringed the Licensed IP.

75.     Except for its letter dated March 19, 2026 and attached correspondence, Bio-Rad has never discussed its belief that Quanterix's products infringed the Licensed IP with Brandeis.

76.     Since acquiring RainDance, the only information that Bio-Rad has ever provided to Brandeis regarding licensing efforts has been through its Annual Reports (as required by

Section 3.2 of the Agreement), which never mentioned Quanterix, its products, the infringement concerns, or the correspondence described above.

77.    Bio-Rad's letters to Quanterix demonstrate that Bio-Rad was aware of actual, potential, or threatened infringement by Quanterix no later than August 28, 2018, yet failed to notify Brandeis of such infringement for approximately *seven and a half years*, until March 19, 2026. This delay of approximately seven and a half years is not notification "with reasonable promptness" as required by Section 6.1 of the Agreement.

78.    Bio-Rad's letters to Quanterix also confirm that Bio-Rad viewed the Licensed IP as covering at least Quanterix's Simoa Bead Technology—the same Licensed IP that Bio-Rad claims in this litigation does not cover any of its own products. Bio-Rad cannot credibly assert that the Licensed IP covers Quanterix's products for purposes of licensing demands while simultaneously maintaining that similar or overlapping technology does not constitute Licensed Products for royalty purposes.

79.    On information and belief, Bio-Rad deliberately withheld notice from Brandeis to preserve exclusive control over the Quanterix licensing opportunity while preventing Brandeis from independently enforcing its patent rights against Quanterix.

80.    As a direct and foreseeable consequence of Bio-Rad's failure to provide timely notice under Section 6.1, Brandeis has been deprived of the opportunity to enforce the Licensed IP against Quanterix for a substantial period. Under 35 U.S.C. § 286, patent damages are limited to infringement committed within six years prior to the filing of a complaint. Bio-Rad's delay of approximately seven and a half years means that any infringement action Brandeis may now file against Quanterix will only recover damages dating back to approximately 2020, thereby depriving Brandeis of at least two years of recoverable damages for Quanterix's infringement.

81.     Had Bio-Rad provided timely notice in 2018 (or at any time reasonably promptly thereafter), Brandeis could have evaluated whether to enforce the Licensed IP against Quanterix within the full statutory damages window, preserving recovery for infringement dating back to at least 2018.

82.     On information and belief, given the significant gap between its correspondence with Quanterix and its ultimate notice to Brandeis, Bio-Rad never truly intended to prosecute infringement against Quanterix. Instead, Bio-Rad purposefully chose not to disclose its belief that Quanterix was infringing the '221 Patent in order to preserve its first right of enforcement while denying the same to Brandeis.

## COUNT I – BREACH OF CONTRACT

83.     Brandeis re-alleges the allegations above as if set forth herein.

84.     The parties agreed to the valid and binding Agreement, through which Bio-Rad received a license to make, have made, use, sell and offer for sale Licensed Products.

85.     In exchange, Brandeis received royalty rights, audit rights, access to Bio-Rad's records, and Bio-Rad's promise to, among other things, use commercially reasonable best efforts to develop and make available Licensed Products.

86.     Brandeis has complied with its contractual obligations under the Agreement by permitting Bio-Rad to use the Licensed IP subject to the terms of the Agreement.

87.     Bio-Rad's refusal to allow Brandeis access to the requested books, ledgers, and records is a breach of Section 4.4 of the Agreement.

88.     Bio-Rad's failure to promptly report the Cross License or the consideration it received for the Cross License is a breach of Section 2.2 of the Agreement.

89.    Bio-Rad's failure to inform Brandeis of its intent to enforce the Licensed IP against 10X Genomics is a breach of Section 6.3 of the Agreement.

90.    Bio-Rad's failure to obtain Brandeis' consent before entering into the Cross License is a breach of Section 6.4 of the Agreement.

91.    Bio-Rad's failure to notify Brandeis with reasonable promptness of Quanterix's actual, potential, or threatened infringement of the Licensed IP—despite Bio-Rad's awareness of such infringement no later than August 28, 2018—is a breach of Section 6.1 of the Agreement. Bio-Rad did not notify Brandeis of the Quanterix infringement until March 19, 2026, approximately seven and a half years after Bio-Rad first identified the infringement, which is not notification "with reasonable promptness" under any reasonable interpretation of Section 6.1.

92.    If Bio-Rad's assertion that it has not made any sales of Licensed Products is accurate, it has breached its obligation to use commercially reasonable best efforts to market the Licensed IP per Section 3.1 of the Agreement. Indeed, for nearly a decade, Bio-Rad has not taken any actions to develop and market the Licensed IP. If any evidence of such activities exists, Bio-Rad refuses to provide it to the auditor for review—another flagrant breach of the Agreement.

93.    On information and belief, rather than commercializing products it deemed to be Licensed Products, Bio-Rad chose to commercialize allegedly alternative competing products in an effort to avoid paying earned royalties to Brandeis. For example, Bio-Rad continues to invest heavily in droplet technology. In July 2025, Bio-Rad acquired Stilla Technologies and introduced new platforms like the QX Continuum and QX700 series.[10] In failing to commercialize the Licensed Products throughout the term of the Agreement, Bio-Rad continues to breach Section 3.1 of the Agreement.

---

[10] *See, e.g.*, https://investors.bio-rad.com/press-releases/news-details/2025/Bio-Rad-Expands-Droplet-Digital-PCR-Offering-Through-Strategic-Acquisition-and-Platform-Rollout/default.aspx

94.    A breach of Section 3.1 is an express material breach entitling Brandeis to terminate the Agreement. Agreement § 9.1.

95.    Alternatively, if Bio-Rad has sold Licensed Products and has concealed such, it has breached its obligations to report such sales and pay royalties to Brandeis per Sections 4.1 and 4.5 of the Agreement.

96.    Brandeis requests specific performance of the records and audit provision.

97.    Brandeis has been damaged by Bio-Rad's breaches above, including, *inter alia*, by not receiving royalties flowing from the commercializing of Licensed Products, by not receiving the required records and audit, by being forced to hire the undersigned and a professional auditor to prosecute its rights under the Agreement, and by the loss of at least two years of recoverable patent damages against Quanterix caused by Bio-Rad's failure to provide timely notice under Section 6.1

98.    To the extent Bio-Rad's reporting is accurate because Bio-Rad has not sold any Licensed Products, Brandeis seeks compensatory damages for Bio-Rad's failure to commercialize the License Products in violation of Section 3.1 of the Agreement.

99.    Brandeis additionally seeks its damages in obtaining the requested records and audit in an amount to be proved at trial.

### COUNT II – DECLARATORY JUDGMENT

100.    Brandeis re-alleges the allegations above as if set forth herein.

101.    The parties agreed to the valid and binding Agreement, through which Bio-Rad received a license to make, have made, use, sell and offer for sale Licensed Products.

102. In exchange, Brandeis received royalty rights, audit rights, access to Bio-Rad's records, and Bio-Rad's promise to, among other things, use commercially reasonable efforts to develop and make available Licensed Products.

103. Bio-Rad has refused to permit the requested audit as required by Section 4.4 of the Agreement.

104. Brandeis seeks a declaration that Bio-Rad is required to provide access to its books, ledgers, and records for all potential Licensed Products, including all services and other fees otherwise related to potential Licensed Products and Bio-Rad's efforts to bring Licensed Products to market.

105. A declaratory judgment is required so as to guide the parties in their future relationship.

106. As reflected in the Agreement, Brandeis has a definite legal interest in the Licensed IP and the possible royalties (or lack thereof) generated by Bio-Rad's commercialization of the Licensed IP. Bio-Rad has a similar legal interest in its right to develop and sell Licensed Products.

107. By denying Brandeis access to its books, ledgers, and records, Bio-Rad is denying Brandeis' assertion of its legal rights under Section 4.4 of the Agreement.

108. Per Section 4.4 of the Agreement, Bio-Rad's assertion that it does not sell Licensed Products is not a condition precedent to Brandeis' right to review Bio-Rad's books, ledgers, and records.

109. Under these circumstances, Bio-Rad's continued denial of Brandeis' assertion of its legal rights will almost immediately and inevitably result in continued litigation.

110. An actual controversy exists therefore between the parties over construction and execution of the Agreement.

111.    The determination of contractual rights is a proper subject for declaratory judgment in Massachusetts.

112.    Brandeis will suffer hardship absent a declaration by this Court construing and enforcing the Agreement, and has suffered an injury-in-fact for Bio-Rad's refusal to permit the required audit.

113.    Brandeis additionally seeks its damages in obtaining a declaration regarding the audit in an amount to be proved at a post-judgment hearing and after the Court's declaration of Brandeis' rights under the Agreement.

## COUNT III – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

114.    Brandeis re-alleges the allegations above as if set forth herein.

115.    Bio-Rad's knowing refusal to comply with its contractual obligations, including by blocking access to its books, ledgers, and records as required by Section 4.4 of the Agreement, is a breach of the implied covenant of good faith and fair dealing by preventing performance of the Agreement or alternatively withholding Brandeis' right to receive the benefits of the Agreement. Bio-Rad's bad-faith behavior can be inferred from the circumstances described above.

116.    A duty of good faith and fair dealing is implicit in all contracts under Massachusetts law and implied in the performance and enforcement of every term of an express contract.

117.    By repeatedly engaging in practices that deprived Brandeis of its contractual rights, such as (i) structuring the Cross License to embed a present, exercisable sublicense option "subject to" Brandeis' agreement while withholding required reports and records; (ii) refusing any allocation or reporting of consideration attributable to the option under Section 2.2.2 of the

Agreement; (iii) blocking or stonewalling the audit despite narrowed, contract-tethered requests; (iv) leveraging the Licensed IP to extract value from 10X Genomics while denying Brandeis consent and participation; (v) refusing to designate Licensed Products while commercializing droplet products, systems, and platforms in the field,[11] and (vi) deliberately withholding notice of Quanterix's infringement for approximately seven and a half years to preserve Bio-Rad's exclusive control over the licensing opportunity while depriving Brandeis of its right to enforce the Licensed IP and recover damages within the full statutory period, Bio-Rad has continually shown bad faith in performing the terms of the Agreement.

118.    Bio-Rad's conduct with respect to Quanterix is particularly indicative of bad faith. Bio-Rad identified Quanterix as an infringer of the Licensed IP no later than August 2018, repeatedly asserted infringement in correspondence spanning nearly seven and a half years, and sent those letters in its capacity as "exclusive licensee" of the Licensed IP from Brandeis—yet deliberately concealed this activity from Brandeis. Bio-Rad's Annual Reports during this period made only vague references to "sublicensing efforts" without ever mentioning Quanterix, its products, or the infringement concerns. On information and belief, Bio-Rad knew of its obligation under Section 6.1 to notify Brandeis with reasonable promptness and deliberately chose not to do so.

119.    As a result of Bio-Rad's failure to abide by its obligations and promises, Brandeis has been damaged in an amount to be proved at a post-judgment hearing.

## COUNT IV – VIOLATION OF M.G.L. CH. 93A § 2

120.    Brandeis re-alleges the allegations above as if set forth herein.

---

[11] *See, e.g.*, https://investors.bio-rad.com/press-releases/news-details/2025/Bio-Rad-Offers-to-Acquire-Digital-PCR-Developer-Stilla-Technologies/default.aspx (declaring Bio-Rad made "$2.6 billion in revenues in 2024.").

121.    Bio-Rad's breaches, especially given Brandeis' requests for records, are malicious, willful, reckless, wanton, or in bad faith.

122.    Additionally, Bio-Rad's surreptitious "option" to 10X Genomics as valuable consideration without reporting the same to Brandeis or paying Brandeis any royalties, and Bio-Rad's refusal to cooperate with Brandeis' audit request under the guise of not selling any Licensed Products are deceptive acts.

123.    Bio-Rad's deliberate concealment of Quanterix's infringement of the Licensed IP for approximately seven and a half years—while simultaneously asserting its exclusive license from Brandeis in letters to Quanterix—constitutes additional unfair and deceptive conduct. Bio-Rad leveraged its position as Brandeis' exclusive licensee to pursue its own commercial interests with Quanterix while deliberately withholding from Brandeis the information necessary for Brandeis to protect its own rights

124.    Through its conduct, Bio-Rad knowingly breached the Agreement with the intention of securing benefits not owing to it under the Agreement.

125.    The unfair and deceptive acts occurred primarily and substantially in Massachusetts.

126.    The Agreement selects Massachusetts courts.

127.    Brandeis' licensing program and audit administration are based in Waltham, Massachusetts.

128.    The audit notice issued from Massachusetts.

129.    Bio-Rad directed performance and non-performance into Massachusetts, such as delivery of required progress reports and payment of Agreement related fees.

130. Brandeis' injury to its Massachusetts-administered royalty stream and audit rights was felt in Massachusetts.

131. Bio-Rad's concealment of settlement consideration related to the Licensed IP pursuant to the option right and Bio-Rad's refusal to honor the audit and reporting obligations, and Bio-Rad's concealment of Quanterix's infringement were unethical and unscrupulous.

132. Brandeis has suffered damage as a result of Bio-Rad's conduct, including monetary damages that cannot be accurately determined absent access to Bio-Rad's books, ledgers, and records, as well as at least two years of lost patent enforcement damages against Quanterix caused by Bio-Rad's failure to provide timely contractual notice.

### **PRAYER FOR RELIEF**

Brandeis respectfully requests that judgment be entered in its favor against Bio-Rad and that the Court grant the following relief:

a. Damages for Bio-Rad's failure to use reasonable efforts to commercialize the Licensed IP in accordance with Section 3 of the Agreement;

b. Damages for Bio-Rad's failure to pay royalties, if the audit shows that unpaid royalties are owed;

c. An Order requiring Bio-Rad to specifically perform its contractual obligations under Section 4.4. of the Agreement, including but not limited to providing all information requested in Brandeis' September 3, 2024 Audit Notification;

d. A declaratory judgment as set forth in Count II above;

e. Damages for Bio-Rad's breach of Section 6.1 of the Agreement, including but not limited to lost patent enforcement damages against Quanterix caused by Bio-Rad's

failure to notify Brandeis of Quanterix's infringement with reasonable promptness, in an amount to be proved at trial;

f.      In the alternative, to the extent that the precise quantum of damages for Bio-Rad's breach of Section 6.1 requires further development, judgment and nominal damages for such breach;

g.      Treble damages pursuant to M.G.L. ch. 93A § 11;

h.      Pre- and post-judgment interest;

i.      Reasonable costs and attorneys' fees; and

j.      Such other relief as the Court may deem just and proper, in law or in equity.

## JURY DEMAND

Brandeis hereby requests a trial by jury.

Dated: [DATE]                                Respectfully Submitted,

                                            **BRANDEIS UNIVERSITY**,
                                            By its attorneys,

                                            /s/ *DRAFT PROPOSAL*_____
                                            Alfonso Garcia Chan*
                                            Halima Shukri Ndai**
                                            CAHILL GORDON & REINDEL LLP
                                            900 16th Street, N.W., Suite 500
                                            Washington, DC 20006
                                            Telephone: (202) 862-8900
                                            achan@cahill.com
                                            hndai@cahill.com

                                            Aaron Dettman*
                                            CAHILL GORDON & REINDEL LLP
                                            32 Old Slip
                                            New York, NY 10005
                                            Telephone: (212) 701-3000
                                            adettman@cahill.com

                                            Daniel J. Cloherty (BBO #565772)
                                            Melanie Stallone (BBO 711658)
                                            CLOHERTY & STEINBERG LLP
                                            One Financial Center, Suite 1120
                                            Boston, MA 02111
                                            Telephone: 617-481-0160
                                            dcloherty@clohertysteinberg.com
                                            mstallone@clohertysteinberg.com

                                            *Leave to appear pro hac vice granted on
                                            October 21, 2025

                                            **Leave to appear pro hac vice granted on
                                            October 24, 2025

# Exhibit F



**Bio-Rad
Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048

**August 28, 2018**

**VIA FEDEX**

Mr. Kevin Hrusovsky
President, Chairman, CEO
Quanterix, Inc.
113 Hartwell Avenue
Lexington, MA 02421

Re: Bio-Rad Droplet Technology Patents

Dear Mr. Hrusovsky:

Bio-Rad Laboratories, Inc. is the owner or exclusive licensee of patents relating to the formation and applications of microfluidic droplets, including U.S. Patent No. 8,592,221, and other U.S. and foreign patents. ("Droplet Technology Patents"), with representative claims as follows:

1. A method, comprising:
    providing a microfluidic network comprising a first region and a microfluidic channel in fluid communication with the first region;
    flowing a first fluid in a first direction in the microfluidic channel;
    flowing a second fluid in the first direction in the microfluidic channel;
    partitioning at least a portion of the first fluid in the first region by flowing the second fluid past the first region, so as to form a first droplet of the first fluid in the first region; and
    maintaining the droplet in the first region while the second fluid is flowing in the first direction.

24. A method, comprising:
    providing a microfluidic network comprising at least a first inlet to a microfluidic channel, a first and a second region for forming a first and a second droplet, respectively, the first and second regions in fluid communication with the microfluidic channel;
    flowing a first fluid in the microfluidic channel;
    partitioning a first portion of the first fluid in the first region by flowing a second fluid past the first region, so as to form the first droplet in the first region; and
    partitioning a second portion of the first fluid at the second region, at least in part through action of the second fluid, so as to form the second droplet at the second region.

 **Bio-Rad Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048

It has come to our attention that Quanterix has been making and selling the Simoa HD-1 Analyzer and SR-X Ultra-Sensitive Biomarker Detection System, as shown in the attached screen shots from the Quanterix website. Based on publicly available descriptions and images of the Simoa Analyzer and SR-X System, it appears that each of these systems utilizes technology covered by the '221 patent and potentially other of Bio-Rad's Droplet Technology Patents.

Bio-Rad is extending an invitation to Quanterix to license the Droplet Technology Patents for use in connection with the Simoa HD-1 Analyzer and SR-X Ultra-Sensitive Biomarker Detection System. In light of your company's use of Bio-Rad's droplet technology, we would like to discuss a potential licensing arrangement as soon as possible.

If you agree, please let us know by September 18, 2018 and we can set up a call or meeting to discuss licensing. I can be reached by phone at 925-523-1113 and by email at josh_shinoff@bio-rad.com.

Very truly yours,

Josh Shinoff, Ph.D., Vice President, Business Development



**Bio-Rad Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048

## INTRODUCING THE HD-1 ANALYZER

The Simoa HD-1 Analyzer is a fully automated instrument for running immunoassays using the Quanterix single molecule array, or Simoa, platform. Simoa is a digital form of ELISA, trapping and sealing individual immunocomplexes on paramagnetic beads in thousands of femtoliter sized wells in arrays found on the Simoa Discs. By leveraging the digital detection format of Simoa technology the HD-1 enables researchers to precisely measure protein biomarkers with substantially higher sensitivity allowing the application of precision science to precision health.



### SIMOA
**Introducing the world's most sensitive, fully automated immunoassay platform with multiplexing and custom assay capability**

Key features include:

- Unprecedented sensitivity
- Full automation
- Precision
- Wide dynamic range
- Easy & cost-effective implementation
- Multiplexing capability with small sample volumes
- Homebrew capabilities
- ~400 samples per shift
- Available for RUO

## INTRODUCING THE SR-X ULTRA-SENSITIVE BIOMARKER DETECTION SYSTEM

The Quanterix SR-X™ Ultra-Sensitive Biomarker Detection System is the latest instrument powered by Simoa technology, offering researchers access to ultra-sensitive biomarker detection capabilities in a compact and affordable system. The SR-X is designed for multiplex detection of up to six analytes per well, with low volume requirements to increase productivity and throughput, while conserving your precious samples. A menu of over 70 Simoa assay kits will be available to measure critical biomarkers with substantially higher sensitivity than standard immunoassay methods, enabling detection of both normal and acute levels with high precision across a range of sample types.

The Quanterix SR-X also provides researchers with the additional flexibility to design assays to detect both protein and nucleic acid biomarkers direct from blood without the need for error-prone complex pre-analytical extraction and amplification steps. This unique capability enables measurement of ultra-sensitive nucleic acid levels, including miRNA, without PCR.



### QUANTERIX SR-X ULTRA-SENSITIVE BIOMARKER DETECTION SYSTEM
**Key Features**

- Multiplex detection without compromising sensitivity or specificity
- Simple 2-step or 3-step workflow with minimal user intervention
- Compact instrument with built-in touchscreen control and comprehensive data analysis tools
- No daily or monthly user maintenance
- Simple custom assay development for both protein and circulating nucleic acid detection

**REQUEST A QUOTE FOR THE SR-X**



**Bio-Rad
Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048



antibody-coated
paramagnetic beads

antibody-coated paramagnetic
beads associated with a single
enzyme-labeled immunocomplex

aqueous resorufin-β-D-
galactopyranoside

sealing
fluorocarbon oil

*Lab Chip*, 2012, **12**, 977

 **Bio-Rad Laboratories, Inc.**

*Corporate Offices*
*1000 Alfred Nobel Drive*
*Hercules, California 94547*
*Phone: 510-724-7000*
*Fax: 510-741-4048*

**July 23, 2019**

**VIA FEDEX**

Mr. Kevin Hrusovsky
President, Chairman, CEO
Quanterix, Inc.
113 Hartwell Avenue
Lexington, MA  02421

Re: Bio-Rad Droplet Technology Patents

Dear Mr. Hrusovsky:

I am following up on my letter dated August 28, 2018, a reply from Brian Keane, General Counsel of Quanterix, date November 9, 2018, and other communications between Bio-Rad Laboratories, Inc. and Quanterix. These communications discussed the relevance of U.S. Patent No. 8,592,221, and other U.S. and foreign patents ("Droplet Technology Patents") owned by or exclusively licensed to Bio-Rad to Quanterix' Simoa HD-1 Analyzer and SR-X Ultra-Sensitive Biomarker Detection System.

As an update I draw your attention to recently issued U.S. Patent No. 10,357,772 with representative claims as follows:

1. A method for partitioning a fluid sample, the method comprising:
    providing a microfluidic device having a substrate comprising a plurality of microwells in fluid communication with an inlet;
    introducing a first fluid into the inlet of the microfluidic device, the first fluid comprising a biological sample and a plurality of beads, each bead comprising a reactive component for binding a target molecule from the biological sample to the bead;
    introducing a second fluid immiscible with the first fluid into the microfluidic device and flowing the second fluid towards each of the plurality of microwells so as to form partitions of fluid in corresponding microwells, each partition of fluid comprising a subvolume of the first fluid, including at least the biological sample and a single bead, wherein each partition of fluid is separated from one another by the second fluid; and
    maintaining each partition of fluid in corresponding microwells for detection of contents in each partition of fluid.



**Bio-Rad
Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048

13. A method for partitioning a fluid sample, the method comprising:

providing a microfluidic device having a substrate comprising a plurality of regions in fluid communication with an inlet;

introducing a first fluid into the inlet of the microfluidic device, wherein the first fluid is aqueous, the first fluid comprising a biological sample and a plurality of beads, each bead comprising a reactive component for binding a target protein molecule from the biological sample to the bead;

partitioning the first fluid into a plurality of aqueous fluid partitions confined within a plurality of corresponding regions of the substrate by introducing a second fluid immiscible with the first fluid into the microfluidic device and flowing the second fluid towards the plurality of regions, wherein each aqueous fluid partition comprises a subvolume of the first fluid, including a single bead, and wherein each fluid partition is separated from one another by the second fluid; and

maintaining each aqueous fluid partition in corresponding regions for detection of contents in each fluid partition.

Based on publicly available descriptions and images of the Simoa Analyzer and SR-X System, it appears that each of these systems utilizes technology covered by the '221 and '772 patents and potentially other of Bio-Rad's Droplet Technology Patents.

Bio-Rad is reiterating our invitation to Quanterix to license the Droplet Technology Patents for use in connection with the Simoa HD-1 Analyzer and SR-X Ultra-Sensitive Biomarker Detection System. In light of your company's use of Bio-Rad's droplet technology, we would like to discuss a potential licensing arrangement as soon as possible.

If you agree, please let us know by August __, 2019 and we can set up a call or meeting to discuss licensing. I can be reached by phone at 925-474-9042 and by email at josh_shinoff@bio-rad.com.

Very truly yours,

DocuSigned by:

26248BFF47D64DB...

Josh Shinoff, Ph.D., Vice President, Business Development

7/23/2019



**Bio-Rad
Laboratories, Inc.**

*Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048*

## INTRODUCING THE HD-1 ANALYZER

The Simoa HD-1 Analyzer is a fully automated instrument for running immunoassays using the Quanterix single molecule array, or Simoa, platform. Simoa is a digital form of ELISA, trapping and sealing individual immunocomplexes on paramagnetic beads in thousands of femtoliter sized wells in arrays found on the Simoa Discs. By leveraging the digital detection format of Simoa technology the HD-1 enables researchers to precisely measure protein biomarkers with substantially higher sensitivity allowing the application of precision science to precision health.



**SIMOA**
**Introducing the world's most sensitive, fully automated immunoassay platform with multiplexing and custom assay capability**

Key features include:

- Unprecedented sensitivity
- Full automation
- Precision
- Wide dynamic range
- Easy & cost-effective implementation
- Multiplexing capability with small sample volumes
- Homebrew capabilities
- ~400 samples per shift
- Available for RUO

## INTRODUCING THE SR-X ULTRA-SENSITIVE BIOMARKER DETECTION SYSTEM

The Quanterix SR-X™ Ultra-Sensitive Biomarker Detection System is the latest instrument powered by Simoa technology, offering researchers access to ultra-sensitive biomarker detection capabilities in a compact and affordable system. The SR-X is designed for multiplex detection of up to six analytes per well, with low volume requirements to increase productivity and throughput, while conserving your precious samples. A menu of over 70 Simoa assay kits will be available to measure critical biomarkers with substantially higher sensitivity than standard immunoassay methods, enabling detection of both normal and acute levels with high precision across a range of sample types.

The Quanterix SR-X also provides researchers with the additional flexibility to design assays to detect both protein and nucleic acid biomarkers direct from blood without the need for error-prone complex pre-analytical extraction and amplification steps. This unique capability enables measurement of ultra-sensitive nucleic acid levels, including miRNA, without PCR.



**QUANTERIX SR-X ULTRA-SENSITIVE BIOMARKER DETECTION SYSTEM**
**Key Features**

- Multiplex detection without compromising sensitivity or specificity
- Simple 2-step or 3-step workflow with minimal user intervention
- Compact instrument with built-in touchscreen control and comprehensive data analysis tools
- No daily or monthly user maintenance
- Simple custom assay development for both protein and circulating nucleic acid detection

**REQUEST A QUOTE FOR THE SR-X**



**Bio-Rad
Laboratories, Inc.**

*Corporate Offices*
*1000 Alfred Nobel Drive*
*Hercules, California 94547*
*Phone: 510-724-7000*
*Fax: 510-741-4048*



antibody-coated
paramagnetic beads

antibody-coated paramagnetic
beads associated with a single
enzyme-labeled immunocomplex

aqueous resorufin-β-D-
galactopyranoside

sealing
fluorocarbon oil

*Lab Chip*, 2012, **12**, 977



**Bio-Rad
Laboratories, Inc.**

*Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048*

August 13, 2021

**VIA FEDEX AND EMAIL**
**SUBJECT TO RULE 408+ AND CONFIDENTIALITY AGREEMENT**

John Fry
General Counsel
Quanterix Corporation
900 Middlesex Turnpike
Billerica, MA 01821

Re: U.S. Patent Nos. 8,592,221, 10,357,772 and 10,960,397.

Dear John:

I'm writing to follow up on Josh Shinoff's letter dated May 13, 2021. To date, we have not received a response from Quanterix. We continue to believe that, despite our notices dating back to 2018, Quanterix continues to utilize Bio-Rad's patented technology. Please contact me or Josh Shinoff to discuss this matter.

Very truly yours,

John J. Cassingham
VP, Asst. General Counsel
Bio-Rad Laboratories, Inc.

Cc: Brian Keane [via email: bkeane@quanterix.com]; John Fry [via email: jfry@quanterix.com]; Josh Shinoff [via email: josh_shinoff@bio-rad.com]; John Cassingham [via email: john_cassingham@bio-rad.com]



**Bio-Rad
Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048

May 24, 2024

**VIA UPS**

Laurie Churchill
SVP and General Counsel
Quanterix Corporation
900 Middlesex Turnpike, Building 1
Billerica, MA 01821

Re: U.S. Patent Nos. 8,592,221, 10,357,772, 10,960,397, 10,286,396, and 11,618,024

Dear Ms. Churchill:

In our letters dated August 28, 2018, July 23, 2019, and May 13, 2021, we notified
Quanterix of U.S. Patent Nos. 8,592,221, 10,357,772, and 10960,397. I am writing to
additionally notify you of U.S. Patent Nos. 10,286,396 and 11,618,024, which are also
patents under exclusive license to Bio-Rad from Brandeis University. Copies of the '396
and '024 patents are enclosed.

The '396 and '024 patents relate to, *inter alia*, "Microfluidic structures and methods for
manipulating fluids, fluid components, and reactions . . . ." *See* '396 Patent at Abstract.
The '396 and '024 patents describe, *inter alia*, that "FIG. 8 shows a method for forming,
positioning, and/or maintaining a droplet[1] in a region of a microfluidic network according
to one embodiment of the invention." *See* '396 Patent at 15:9-11. Figure 8 of the '396
and '024 patents is partially reproduced below.



---

[1] The '396 and '024 patents describe: "'droplet' means a small portion of a fluid, isolated
from other portions of the same fluid. . . . A droplet of a first fluid can be surrounded by
different, immiscible fluid, or bounded by a surface of an article . . . ." *See* '396 Patent at
5:50-55.

The '396 and '024 patents describe, *inter alia*, that: "As shown in FIG. 8C, a first fluid 1200 (e.g., a fluid to be stored as droplets) is flowed into channel 1002 in the direction of arrow 1012" and "As shown in FIG. 8E, a second fluid 1202 may then be flowed into channel 1002 in the direction of arrow 1012. This second fluid may be immiscible with the first fluid. At upstream portion 1006, the second fluid bypasses fluid path 1014 (including region 1028) due the presence of the first fluid at that region. The flowing of this second fluid causes partitioning of the first fluid so as to form droplet 1200-A at the first region." *See* '396 Patent at 15:48-50, 15:65-16:5.

Based on the public information currently available to and reviewed by Bio-Rad, Quanterix's activities related to the Simoa Bead Technology appear to utilize the technology disclosed in the '396 and '024 patents. As non-limiting examples, Bio-Rad is providing exemplary claim charts for the '396 and '024 patents in Appendices 1 and 2 of this letter.

Please contact me or Josh Shinoff, Ph.D., VP, Business Development (josh_shinoff@bio-rad.com) at your convenience to discuss.[2]

Very truly yours,

John Cassingham
VP, Asst, General Counsel
Bio-Rad Laboratories, Inc.
1000 Alfred Nobel Drive
Hercules, CA 94547
Email: john_cassingham@bio-rad.com

Cc: Josh Shinoff, VP, Business Development, Life Sciences Group and Digital Biology Group [via email: josh_shinoff@bio-rad.com]

---

[2] This letter (including the attached appendices) is not intended to be an exhaustive or conclusive statement of Bio-Rad's positions. Bio-Rad's investigation is continuing. Bio-Rad may make different, additional, or alternative arguments. Nothing in this letter should be understood as construing any claims and/or broadening/narrowing/limiting any position Bio-Rad may take in the future or has taken in the past. Bio-Rad reserves all legal and equitable rights.

2

# Appendix 1

U.S. Patent No. 10,286,396

| U.S. Patent No. 10,286,396, Claim 1 | Quanterix's Simoa Bead Technology |
|---|---|
| 1. A method of partitioning a fluid in a microfluidic network, comprising | "Here, we report a method based on polymeric arrays that are sealed with oil in a microfluidic device that greatly simplifies the isolation of single beads in femtolitre volumes"<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 977. |
| providing a microfluidic network | "Here, we report a method based on polymeric arrays that are sealed with oil in a microfluidic device that greatly simplifies the isolation of single beads in femtolitre volumes"<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 977. |
| comprising a plurality of sections | "A schematic diagram of loading, sealing, and imaging of single paramagnetic beads in arrays of femtolitre-sized wells"<br><br> |

| | https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
|---|---|
| each comprising a microfluidic inlet, a first region, and a second region, | Each well has a microfluidic inlet, a first region, and a second region.<br><br><br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| wherein the plurality of sections are in fluid communication with each other; | The wells are in fluid communication.<br><br><br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| flowing a sample fluid of volume X through a first section, | "beads associated with enzyme-labeled PSA molecules suspended in 15 mL of 100 mM RGP were loaded into the assembly through the fluidic inlet port"<br><br><br><br>First section<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| wherein the sample fluid comprises a reactive component; | "beads associated with enzyme-labeled PSA molecules suspended in 15 mL of 100 mM RGP were loaded into the assembly through the fluidic inlet port"<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |

| | |
|---|---|
| partitioning sample fluid at a first region of the first section into a first subset of volume of the sample fluid and a first remaining volume of the sample fluid, wherein the first subset of volume fills the first region of the first section; | First remaining volume<br><br>First subset of volume<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| flowing the first remaining volume of the sample fluid to a second section positioned downstream from the first section; | First remaining volume<br><br>Second section<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| partitioning the first remaining volume of the sample fluid at a first region of the second section into a second subset of volume of the sample fluid and a second remaining volume of the sample fluid, wherein the second subset of volume fills the first region of the second section; and | Second remaining volume<br><br>Second subset of volume<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| sequentially partitioning the second remaining volume, and any additional remaining volumes, of the sample fluid at one or more additional sections positioned downstream from the second section into one or more additional subsets of volume of the sample fluid filling respective first regions of the one or more additional sections and corresponding one or more additional remaining volumes of the sample fluid, until the one or more additional subsets of volume of the | One or more additional sections<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980 |

| sample fluid fails to fully fill a first region of the one or more additional sections. | |
|---|---|

# Appendix 2

U.S. Patent No. 11,618,024

| U.S. Patent No. 11,618,024, Claim 1 | Quanterix's Simoa Bead Technology |
|---|---|
| 1. A method for droplet formation, the method comprising: | "a microfluidic device that greatly simplifies the isolation of single beads in femtolitre volumes"<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 977.<br><br>"(C) Fluorocarbon sealing fluid is introduced into the channel to displace the aqueous medium and excess beads, and to seal the wells. (D) The channel is filled with the fluorocarbon sealing oil and the individual femtolitre-sized wells are sealed and isolated followed by fluorescence imaging."<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| providing a microfluidic network | "Here, we report a method based on polymeric arrays that are sealed with oil in a microfluidic device that greatly simplifies the isolation of single beads in femtolitre volumes"<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 977. |
| comprising a first inlet to a microfluidic channel, wherein the microfluidic channel comprises a first region and a second region; | There is a first inlet to a microfluidic channel. The microfluidic channel has multiple regions.<br><br><br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |

7

| | |
|---|---|
| introducing a fluid into the microfluidic channel, the first fluid comprising a biological sample and a plurality of beads, | <br><br>"beads associated with enzyme-labeled PSA molecules suspended in 15 mL of 100 mM RGP were loaded into the assembly through the fluidic inlet port"<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| each bead comprising a reactive component for binding a target molecule from the biological sample; and | "2.7-mm diameter carboxyl-terminated paramagnetic beads were functionalized with a monoclonal antibody to prostate specific antigen (PSA) using EDC coupling according to the manufacturer's instructions."<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 979. |
| flowing an immiscible oil in the microfluidic channel, | <br><br>"(C) Fluorocarbon sealing fluid is introduced into the channel to displace the aqueous medium and excess beads, and to seal the wells. (D) The channel is filled with the fluorocarbon sealing oil and the individual femtolitre-sized wells are sealed and isolated followed by fluorescence imaging."<br><br>https://pubs.rsc.org/en/content/articlepdf/2012/lc/c2lc20744c at p. 980. |
| wherein the oil and the fluid meet at a junction between said first region and second region, | |

| | |
|---|---|
| and wherein said oil breaks a portion of the fluid from a continuous volume of the fluid |  |
| thereby to form and trap a droplet of said fluid in said second region, wherein the second region is a well. | c <br><br> Trap a droplet |



**Bio-Rad
Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048

March 12, 2026

**VIA FEDEX**
Daniel Char
Chief Legal Officer
Quanterix Corporation
900 Middlesex Turnpike, Building 1
Billerica, MA 01821

Re: U.S. Patent Nos. 8,592,221, 10,357,772, 10,960,397, 10,286,396, 11,618,024, 10,675,626, and 11,224,876

Dear Mr. Char:

As Vice President of Business Development at Bio-Rad Laboratories, Inc. ("Bio-Rad"), I write to inform Quanterix about certain patents to which Bio-Rad has exclusive rights from Brandeis University.  Bio-Rad has previously notified Quanterix of U.S. Patent Nos. 8,592,221, 10,357,772, 10,960,397, 10,286,396, and 11,618,024.  I am writing to notify you of additional U.S. Patent Nos. 10,675,626, and 11,224,876, which are also under exclusive license to Bio-Rad from Brandeis University.  Copies of the above patents ("Bio-Rad Patents") are enclosed.  Copies of Bio-Rad's four (4) prior letters to Quanterix, dated May 24, 2024, August 13, 2021, July 23, 2019 and August 28, 2018 are attached.

It appears that despite our prior letters, Quanterix continues to make and sell products such as the Simoa Bead Technology that appear to utilize technology covered by the above patents.

As detailed in Bio-Rad's prior letters, the Bio-Rad Patents claim, *inter alia*, microfluidic structures and methods for manipulating fluids, fluid components, and reactions.  For example, the Bio-Rad Patents relate to "a method for forming, positioning, and/or maintaining a droplet[1] in a region of a microfluidic network" as described in Figure 8 of the specification. *See, e.g.,* '396 Patent at 15:9-11.  Figure 8 of the Bio-Rad Patents is partially reproduced below.

---

[1] The Bio-Rad Patents describe: "'droplet' means a small portion of a fluid, isolated from other portions of the same fluid. . . . A droplet of a first fluid can be surrounded by different, immiscible fluid, or bounded by a surface of an article . . . ." *See, e.g.,* '396 Patent at 5:50-55.



The Bio-Rad Patents relate to methods and structures, *inter alia*, where "[a]s shown in FIG. 8C, a first fluid 1200 (e.g., a fluid to be stored as droplets) is flowed into channel 1002 in the direction of arrow 1012" and "As shown in FIG. 8E, a second fluid 1202 may then be flowed into channel 1002 in the direction of arrow 1012. This second fluid may be immiscible with the first fluid. At upstream portion 1006, the second fluid bypasses fluid path 1014 (including region 1028) due the presence of the first fluid at that region. The flowing of this second fluid causes partitioning of the first fluid so as to form droplet 1200-A at the first region." *See, e.g.,* '396 Patent at 15:48-50, 15:65-16:5.

Bio-Rad expects Quanterix to proceed fully aware of and respecting Bio-Rad's intellectual property rights. We are available to discuss our patent portfolio or potential avenues for licensing.

Please contact me at your earliest convenience to discuss this matter.[2] This correspondence is made without waiver of any of Bio-Rad's rights or remedies.

Very truly yours,

DocuSigned by:

*[signature]*

26248BFF47D64DB...

Josh Shinoff, Ph.D.
Vice President, Business Development
Bio-Rad Laboratories, Inc.
1000 Alfred Nobel Drive
Hercules, CA 94547
Email: josh_shinoff@bio-rad.com

Cc: John Cassingham, VP, Asst. General Counsel, Bio-Rad Laboratories, Inc. [via email: john_cassingham@bio-rad.com]

---

[2] This letter (including attachments and enclosures) is not intended to be an exhaustive or conclusive statement of Bio-Rad's positions. Bio-Rad's investigation is continuing. Bio-Rad may make different, additional, or alternative arguments. Nothing in this letter should be understood as construing any claims and/or broadening/narrowing/limiting any position Bio-Rad may take in the future or has taken in the past. Bio-Rad reserves all legal and equitable rights.

2



**Bio-Rad**
**Laboratories, Inc.**

Corporate Offices
1000 Alfred Nobel Drive
Hercules, California 94547
Phone: 510-724-7000
Fax: 510-741-4048

March 19, 2026

**VIA FEDEX**

Rajnish Kaushik
Director, Licensing and Strategic Alliances
Office of Technology Licensing
Brandeis University
415 South Street
MS 115
Waltham, MA 02454-9110

**RE: Bio-Rad Letter and Enclosures to Quanterix Corporation, dated March 12, 2026**

Dear Rajnish:

At the request of John Cassingham, VP, Asst. General Counsel, please find enclosed a copy of Bio-Rad's March 12, 2026 letter and enclosures to Daniel Char, Chief Legal Officer, Quanterix Corporation.

Very Truly Yours,

Victoria Escalada
Legal Operations Specialist
Bio-Rad Laboratories, Inc.
1000 Alfred Nobel Drive
Hercules, CA 94547